# EXHIBIT “1”

*14594471*

SUM-100

ORIGINAL

FILE BY FAX

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

BAYER CORP., an Indiana corporation, et al (See Additional Parties Attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

Norma Scott, Plaintiff

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

FILED
ALAMEDA COUNTY
MAY 16 2016
CLERK OF THE SUPERIOR COURT
By [signature] Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (*www.sucorte.ca.gov*), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (*www.lawhelpcalifornia.org*), en el Centro de Ayuda de las Cortes de California, (*www.sucorte.ca.gov*) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* ALAMEDA SUPERIOR COURT
1225 Fallon Street
Oakland, CA 94612

CASE NUMBER: *(Número del Caso):* RG16815918

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
M. Elizabeth Graham, Grant & Eisenhoffer, 123 Justison Street, Wilmington, DE 19801, (302)622-7000

DATE: *(Fecha)* MAY 16 2016 Chad Finke Clerk, by *(Secretario)* [signature], Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]
SUPERIOR COURT OF CALIFORNIA
EUREKA
COUNTY OF ALAMEDA

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under:
- ☐ CCP 416.10 (corporation)
- ☐ CCP 416.20 (defunct corporation)
- ☐ CCP 416.40 (association or partnership)
- ☐ CCP 416.60 (minor)
- ☐ CCP 416.70 (conservatee)
- ☐ CCP 416.90 (authorized person)
- ☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

SUM-200(A)

| SHORT TITLE: NORMA SCOTT v. BAYER CORP., et al | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff ☒ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

BAYER HEALTHCARE LLC, a Delaware company;
BAYER ESSURE INC. (f/k/a CONCEPTUS, INC.), a Delaware corporation;
BAYER HEALTHCARE PHARMACEUTICALS, INC., a Delaware corporation;and
DOES 1-10, inclusive.





**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CEB
www.ceb.com

M. Elizabeth Graham, CA 143085
Jay W. Eisenhofer
Thomas V. Ayala
Samantha Mertz
Hilary Hochman
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Phone: (302) 622-7000 / Fax: (302) 622-7100
Email: egraham@gelaw.com
Email: jeisenhofer@gelaw.com
Email: tayala@gelaw.com
Email: smertz@gelaw.com
Email:hhochman@gelaw.com

Robert K. Jenner
**JANET, JENNER & SUGGS, LLC**
Commerce Centre East
1777 Reisterstown Road, Suite 165
Baltimore, Maryland 21208
Phone: (410) 653-3200 / Fax: (410) 653-9030
Email: rjenner@myadvocates.com

Kimberly Dougherty
**JANET, JENNER & SUGGS, LLC**
31 St. James Avenue, Suite 365
Boston, Massachusetts 02116
Phone: (617) 933-1265 / Fax: (410) 653-9030
Email: kdougherty@myadvocates.com

Attorneys for PLAINTIFF NORMA SCOTT

ENDORSED
FILED
ALAMEDA COUNTY

MAY 16 2016

CLERK OF THE SUPERIOR COURT
By Sue Pesko, Deputy

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF ALAMEDA - UNLIMITED JURISDICTION**

NORMA SCOTT

Plaintiff,

vs.

BAYER CORP., an Indiana corporation; BAYER HEALTHCARE LLC, a Delaware company; BAYER ESSURE INC. (F/K/A CONCEPTUS, INC.), a Delaware corporation; BAYER HEALTHCARE PHARMACEUTICALS, INC., a Delaware corporation; and DOES 1-10, inclusive,

**CASE NO.** RG16815918

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

(1) Negligent Failure to Warn
(2) Strict Products Liability – Inadequate Warnings
(3) Negligence / Negligence *Per Se*
(4) Breach of Express Warranty
(5) Negligent Misrepresentation
(6) Fraud

Defendants. )
)
)

COMES NOW Plaintiff NORMA SCOTT, and files this Complaint seeking judgment against Defendants BAYER CORP.; BAYER HEALTHCARE LLC; BAYER ESSURE INC. (F/K/A CONCEPTUS, INC.); BAYER HEALTHCARE PHARMACEUTICALS, INC.; and DOES 1 through 10, inclusive, (hereinafter collectively referred to as "Defendants" or "Bayer") for personal injuries suffered as a result of Plaintiff NORMA SCOTT (hereinafter "Plaintiff") being implanted with the defective and unreasonably dangerous product, Essure®. At all times relevant hereto, Essure® was manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by Defendants.

## I. INTRODUCTION

1. This action arises from Defendants' failures to warn about serious health risks associated with their permanent birth control device, Essure®. Essure® is a Class III medical device that has been approved by the U.S. Food and Drug Administration (FDA) for sale in the United States. When the FDA approved the device, the FDA was not aware that the device could cause serious health risks, such as perforation of the uterus, chronic pain, and prolonged bleeding, as well as unintended pregnancies.

2. After the FDA approved the device for sale and it began to be implanted in patients, Defendants became aware of serious adverse events that should have led Defendants to (a) directly inform healthcare providers and consumers of these risks by revising the warning label for the device and (b) reported the adverse events to the FDA. Defendants failed to warn health care providers and consumers about roughly 16,000 complaints of serious injuries associated with Essure® after the device was approved for sale. Defendants also failed to timely report this new information to the FDA, which, upon evaluating the information, required a black box warning to reflect serious health risks that were ultimately suffered by Plaintiff. If the Defendants had timely and adequately warned Plaintiff's health care providers and Plaintiff of this new risk information, Plaintiff's injuries would have been avoided.

3. Not only did Defendants fail to warn about Essure®'s serious health risks, they also falsely advertised, warranted and represented that Essure® was safer and more effective than other methods of permanent birth control.

4. The conduct of Bayer, as set forth below, violated its obligations under relevant federal and state regulations governing the post-market conduct of Class III medical device manufacturers, as well as Bayer's duties under California law.

## II. PARTIES, JURISDICTION AND VENUE

5. The Court has personal jurisdiction over Defendants Bayer Essure Inc. (f/k/a Conceptus, Inc.) and Bayer HealthCare LLC are citizens of and/or do business in the State of California and a substantial part of the events giving rise to Plaintiff's claims occurred in California, including the formulation, testing, packaging, labeling, production, creation, construction, making, assembly, advertising, clinical testing, marketing, promotion, distribution, and manufacturing of the Essure® system.

6. Venue is proper in this county in accordance with § 395(a) of the California Code of Civil Procedure because Defendant BAYER HEALTHCARE LLC resides in this county and the injuries alleged herein arose from conduct that occurred in this county.

7. Plaintiff Norma Scott is a citizen and resident of Canal Winchester, Franklin County, Ohio.

8. Defendant BAYER CORP. is a for-profit corporation incorporated in the state of Indiana and is a wholly owned subsidiary of Bayer A.G. Defendant is authorized to and does business throughout the state of California.

9. Defendant BAYER HEALTHCARE LLC is a for-profit limited liability company organized under the laws of the state of Delaware and is a wholly owned subsidiary of Bayer A.G. Defendant is authorized to and does business throughout the state of California and has manufacturing operations located in Berkeley, Alameda County, California and research and development operations in San Francisco, San Francisco County, California.

10. Defendant BAYER ESSURE INC. (F/K/A CONCEPTUS, INC.) is a for-profit corporation incorporated in the state of Delaware, and is a wholly owned subsidiary of Bayer A.G. and/or Bayer HealthCare LLC. Conceptus, Inc. ("Conceptus") was founded in 1992 by Julian Nikolchev, a self-described "medical technology developer and serial entrepreneur." On or about April 28, 2013, Conceptus, Inc. entered into an Agreement and Plan of Merger (the "Merger Agreement") with Bayer HealthCare LLC. On or about June 5, 2013, pursuant to the Merger Agreement, Conceptus, Inc. became a wholly owned subsidiary of Bayer HealthCare LLC and/or Bayer A.G., and thereafter was renamed

"Bayer Essure Inc." For purposes of this Complaint, Conceptus, Inc. and Bayer Essure Inc. are one and the same. Bayer Essure Inc.'s headquarters were located at 1021 Howard Avenue, San Carlos, California 94070 until 2005 when they relocated to 331 East Evelyn Avenue, Mountain View, California 94041. In July of 2013, Bayer Essure Inc. moved its headquarters to 1011 McCarthy Boulevard, Milpitas, Santa Clara County, California 95035. Defendant Bayer Essure Inc. is authorized to and does business throughout the state of California.

11. Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is a for-profit corporation incorporated in the state of Delaware and is a wholly owned subsidiary of Bayer A.G. Defendant is authorized to and does business throughout the state of California.

12. The true names and capacities of those defendants designated as DOES 1-10, whether individual, corporate, association or otherwise, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sues said defendants by such fictitious names and will ask leave of Court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the DOE defendants is, in some manner, responsible for the events and happenings herein set forth and proximately and/or directly caused injury and damages to Plaintiff as herein alleged.

## III. <u>DESCRIPTION OF ESSURE®</u>

13. Essure® is a medical device manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by Defendants.

14. Essure® was first manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by Conceptus, Inc. and initially developed under the name Selective Tubal Occlusion Procedure or "S/TOP™" Permanent Contraception device.

15. Essure® is touted as a form of permanent female birth control (female sterilization) with a 99.74% effectiveness rate of preventing pregnancy. Defendants market the device as being safer and more effective than alternative forms of birth control. The device was developed to prevent pregnancy through the insertion of micro-inserts into the fallopian tubes that then expand and anchor, causing

fibrous tissue growth and, in turn, bilateral occlusion (blockage) of the fallopian tubes. Defendants intended the device to be implanted "permanently," *i.e.*, for each patient's lifetime.

16. Essure® consists of three components: (1) two micro-inserts; (2) a disposable delivery system; and (3) a disposable split introducer. All components are intended for a single use.

17. The micro-inserts are composed of two metal coils: one coil made of nitinol (nickel and titanium) and the other made of steel with polyethylene terephthalate ("PET") fibers wound in and around the coil. The micro-inserts are placed in a woman's fallopian tubes via Defendants' disposable delivery system.

18. Defendants' disposable delivery system consists of a single handle that contains a nitinol core delivery wire, release catheter, and delivery catheter. The micro-inserts are attached to the delivery wire. The delivery handle controls the device, delivery, and release. Physicians monitor this process through hysteroscopic equipment including a hysteroscope, a lightbox, and a monitor, collectively known as a "tower." Upon information and belief, the towers were valued at approximately $20,000 and were provided by Defendants to physicians for free if the physician purchased twenty five Essure® units.

19. The hysteroscopic equipment is not part of the Essure® device or any pre-market approval process, but the equipment is necessary for proper implantation of the Essure® device. Defendant Bayer's website warned physicians, "[i]n order to be trained in Essure you must be a skilled operative hysteroscopist." But Bayer's training materials did not include a training manual for hysteroscopic equipment. The Defendants' training was provided not by physicians but by unqualified sales representatives.

20. After placement of the coils in the fallopian tubes, the micro-inserts expand and anchor into the fallopian tubes. Defendants claim in their physician training manual and patient information booklets that the expanded coils and a chronic inflammatory and fibrotic response to the PET fibers elicit tissue growth that blocks the fallopian tubes and prevents pregnancy. According to Defendants, "the tissue in-growth into the insert caused by the PET fibers results in both insert retention and pregnancy prevention."

21. Defendants claim that "correct placement" of Essure® "is performed easily because of the design of the microinsert," and the physician training manuals suggest the system and hysteroscope allow for

visual confirmation of each insert's proper placement during the implant procedure. Defendants further claim in advertising materials that the coils will remain securely in place in the fallopian tubes for the life of the patient, claiming, for example, Essure® is a "proven permanent birth control procedure that works with your body to create a natural barrier against pregnancy" and that its "not reversible."

22. The Instructions for Use ("IFU") accompanying the Essure® device provide that patients should be counseled to receive a confirmation test three months post-implant to determine that the coil micro-inserts have created a complete occlusion in each fallopian tube. The Confirmation Test used is a hysterosalpingogram ("HSG Test") and is part of the Essure® product.

23. Defendants have stated in a publicly available Form 10-K filed with the U.S. Securities and Exchange Commission that HSG is "often painful" and "is also known to be highly inaccurate, with false-positive results in as many as 40% of HSG-diagnosed cases of proximal tubal occlusion ("PTO"). Various factors are believed to be responsible for these false indications of tubal occlusion, including tubal spasm (a natural function of the tubes) and a build-up in the tube of natural cellular debris and mucous." Defendants do not, however, share this information with patients.

24. Essure® was manufactured, marketed, and promoted by Defendants to be used by gynecologists throughout the world. In advertisements and patient information booklets, Defendants claimed their product entailed a "quick and easy," "surgery-free" outpatient "simple" procedure that did not require general anesthesia and "requires no downtime for recovery."

## IV. PRE-MARKET APPROVAL

25. In April 2002, Conceptus submitted its Premarket Approval Application to the United States Food and Drug Administration ("FDA") for the Essure® device.

26. Premarket Approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices based on the information available at the time. *See* 21 U.S.C. § 360(e); 21 C.F.R. § 814.3(e).

27. Under 21 C.F.R. § 814.20, a PMA and/or PMA Supplement application must provide:

a. proposed indications for use;

b. device description including the manufacturing process;

c. any marketing history;

d. summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk considerations);

e. each of the functional components or ingredients of the device;

f. methods used in manufacturing the device, including compliance with current good manufacturing practices; and

g. any other data or information relevant to an evaluation of the safety and effectiveness of the device known or that should reasonably be known to the manufacturer from any source, foreign or domestic, including information derived from investigations other than those proposed in the application and from commercial marketing experience.

28. On November 4, 2002, the FDA conditionally approved Conceptus' Essure® PMA application.

29. The FDA's Conditional Premarket Approval (CPMA) Order for Essure® included the following requirements:

a. conduct a post approval study in the U.S. to "document the bilateral placement rate [of Essure®] for newly trained physicians";

b. establish the effectiveness of Essure® by annually reporting on the patients who took part in the Pivotal and Phase II clinical investigations;

c. include results from the annual reporting on the patients who took part in the Pivotal and Phase II clinical investigations in the labeling as these data become available;

d. submit a PMA supplement when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures, necessitate a labeling, manufacturing, or device modification;

e. submit a PMA supplement whenever there is use of a different facility or establishment to manufacture, process, or package the device;

f. submit a PMA supplement whenever there are changes to the performance of the device;

g. submit a report to the FDA within 10 days after Defendants receive or have knowledge or information of any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that has not been addressed by the device's labeling and must also submit a report to the

FDA within 10 days after receiving or gaining knowledge or information of any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that has been addressed by the device's labeling but is occurring with unexpected severity or frequency;

h. submit a report to the FDA within 10 days after Defendants receive or have knowledge or information of any failure of the device to meet specifications established in the approved PMA that are not correctable by adjustments or procedures described in the approved labeling;

i. include in the Annual Report any failures of the device to meet the specifications established in the approved PMA that were correctable by procedures described in the approved labeling;

j. "[r]eport to the FDA whenever it received information from any source that reasonably suggested that the device may have caused or contributed to a serious injury";

k. Defendants' warranties and representations concerning the product must be truthful, accurate and not misleading; and

l. Defendants' warranties and representations concerning the product must be consistent with applicable Federal and State law.

30. The CPMA Order for Essure® further outlined reporting requirements that Defendants were required to follow under the Medical Device Reporting regulations ("MDR"). Under these requirements, Defendants were required to:

a. report to the FDA within thirty (30) days whenever they receive or otherwise become aware of information, from any source, that reasonably suggests a device may have caused or contributed to serious injury; and

b. report to the FDA within thirty (30) days whenever they receive or otherwise become aware of information, from any source, that reasonably suggests a device has malfunctioned and would be likely to cause or contribute to serious injury if the malfunction were to recur.

31. The CPMA Order acknowledged the Defendants' ability to update safety warnings for Essure® without prior FDA approval by utilizing the "Changes Being Effected" provision in 21 C.F.R. §

814.39(d)(2).

## V. A MANUFACTURER'S OBLIGATION TO UPDATE ITS PRODUCT LABELING TO ACCOUNT FOR NEW SAFETY INFORMATION ARISING AFTER THE DEVICE RECEIVED PRE-MARKET APPROVAL

32. Approval of a device through the PMA process signals the beginning, not the end, of a device manufacturer's duties to patients under both federal regulations and established California law. The FDA's initial approval of a device label amounts to a finding by the FDA that the label is adequate for purposes of gaining initial approval to market the device. It does not represent a finding by the FDA that the label can never be deemed inadequate after approval as new safety information from the real world experience with the device becomes available to the manufacturer. Sound reasons support these principles: there are cases such as Essure® where evidence of the device's defects comes to light only after the device received premarket approval.

33. After Essure® received pre-market approval, Defendants were at all times responsible for maintaining the labeling of Essure® in light of the most current risk information obtained from the real world clinical experience with the device. There is no federal requirement that a manufacturer maintain its original warning language in the face of new safety information. Nor does federal law give device manufacturers a right to market their device using the label originally approved by the FDA when new post-market information bearing on the safety of the device comes to light. To the contrary, the FDCA required Defendants not to sell a device that was accompanied by an inadequate warning or had a label that was false or misleading in any respect, 21 U.S.C. § 352(a), (f)(2), because such a deficient warning rendered the device "misbranded" under 21 U.S.C. § 331.

34. Defendants had the ability under federal law, and the duty under state law and federal law, to directly warn healthcare providers and consumers by unilaterally updating the labeling of Essure® to reflect newly acquired safety information without advance approval by the FDA. 21 C.F.R. § 814.39(d). These updates include:

a. labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association;

b. labeling changes that add or strengthen an instruction that is intended to enhance the safe

use of the device;

c. labeling changes that ensure it is not misleading, false, or contains unsupported indications; and

d. changes in quality controls or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

35. Defendants breached their duties under federal law and state law to maintain labeling that (a) added warnings about the adverse reactions alleged herein for which there was reasonable evidence of a causal association; (b) added instructions for use that would enhance the safe use of the device; and (c) added descriptions of adverse events to ensure that the labeling was not false or misleading.

36. Defendants post-approval obligations under federal law also included duties to:

a. report to the FDA information suggesting that one of the Manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur, and conduct an investigation of each event and evaluate the cause of the event, 21 C.F.R. §§ 803.50, et seq.;

b. monitor the product after pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product, 21 C.F.R. §§ 814, et seq.;

c. submit a PMA Supplement for any change in Manufacturing Site, 21 C.F.R. §§ 814.39, et seq.;

d. establish and maintain quality system requirements to ensure that quality requirements are met, 21 C.F.R. § 820.20, et seq.;

e. establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, 21 C.F.R. §§ 820.30, et seq.;

f. document all Corrective Action and Preventative Actions taken by the Manufacturer to

address non-conformance and other internal quality control issues, 21 C.F.R. §§ 820.100, et seq.;

g. establish internal procedures for reviewing complaints and event reports, 21 C.F.R. § 820.198 and §§ 820.100, et seq.;

h. establish Quality Management System ("QMS") procedures to assess potential causes of non-conforming products and other quality problems, 21 C.F.R. §§ 820.70, et seq. and 21 C.F.R. §§ 820.90, et seq.;

i. report on Post Approval Studies in a timely fashion, 21 C.F.R. §§ 814.80, et seq.; and

j. advertise the device accurately and truthfully, 21 C.F.R. §§ 801, et seq.

37. Had Defendants fulfilled these obligations in a timely fashion, which federal and state law required them to do, Plaintiff's injuries would not have occurred. Defendants failed to do so.

38. The claims in this case concern Defendants' duties that arose after premarket approval of Essure®, when Defendants learned of new information bearing on the safety of its device. Defendants breached these duties to take reasonable steps to prevent foreseeable and intended risks, including to the Plaintiff, in multiple ways, as discussed below.

## VI. DEFENDANTS ENGAGED IN FALSE AND MISLEADING SALES AND MARKETING TACTICS

39. Defendants violated the Essure® CPMA and §§ 502(q) and (r) of the FDCA and parallel state laws by engaging in false and misleading advertising of Essure®.

40. Defendants continue to sell their product with misleading and false advertising in violation of the conditions of the Essure® CPMA and state laws.

41. The marketing campaign for Essure® was described by Defendants as follows: "Through the use of public relations and targeted advertising, we intend to increase awareness of Essure® among consumers, general practitioners and the broader medical community. In April 2003, we presented Essure® at the annual conference of the American College of Obstetricians and Gynecologists. At this meeting, we had two presentations and there was a Continuing Medical Education, or CME, accredited symposium with Essure® as the main topic. In early June 2003, we commenced a direct mail campaign to 500,000 women in the Atlanta and Chicago areas, with the goal of encouraging these women to

Case 3:16-cv-03369-WHA Document 1-1 Filed 06/16/16 Page 15 of 82

contact our call center for additional information. In turn, our call center has the ability to offer a referral to a practicing Essure® physician in a consumer's area. We had also conducted regional advertisement in a variety of magazines, such as *Parents* and *Self.*"

42. In addition, Defendants operated websites for "physicians and patients" and "established a call center for patients that are seeking additional information about Essure® and who wish to be referred to physicians that are trained to perform the Essure® procedure. Physicians that we refer our patients to are those that have chosen to participate in our Essure® Accredited Practice program aimed at providing an optimal patient experience." In reality, the training and medical comprehensiveness of the Essure® Accredited Practice program is a falsehood.

43. Defendants advertised, promoted, and marketed on their websites, in print and/or video advertisements, brochures, and fact sheets stating the following about Essure®, while failing to report the actual material facts:

a. The Essure® patient brochure stated Essure® was the "[o]nly FDA approved female sterilization procedure to have zero pregnancies in the clinical trials" or words to that effect. However, there were actually four pregnancies during the clinical trials and five pregnancies during the first year of commercial experience. Additionally, several pregnancies have been reported subsequent to Essure® implantation. Between 1997-2005, 64 pregnancies were reported to Defendants. Adverse Event Report related to the ESS 205 device dated October 3, 2006 evidences an ectopic pregnancy, which can be life-threatening to the mother, after the three-month Confirmation Test was confirmed. Furthermore, a recent study indicates that women implanted with Essure® have a ten times greater risk of pregnancy after one year than those who use laparoscopic sterilization. At ten years, the risk of pregnancy is almost four times greater.

b. The Essure® website, print advertising, and patient brochure described Essure® as "[s]urgery-free" or words to that effect. However, Essure® is not "surgery-free." All Essure® procedures are done under hysteroscopy, which is a surgical procedure. Defendants also failed to disclose post-market adverse events arising from the implant, and that many of those events required surgery to remove the device. In reality, a recent

controlled study of device found that women who were implanted with the Essure® were 10 times more likely to need reoperations over women who had tubal ligations.

c. The Essure® website, print advertising and patient brochure described Essure® as "[w]orry free," and a "simple procedure performed in your doctor's office" that takes "less than 10 minutes" and "requires no downtime for recovery" and "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures" or words to that effect. However, Defendants concealed and failed to report complaints of perforations and pain which occurred as a result of Essure® as noted above. Essure® can cause women serious, life-altering complications including, but not limited to, debilitating pain, heavy bleeding necessitating medication and/or additional surgical procedures, allergic reactions (including, but not limited to, rashes, itching, bloating, swelling, headaches, and hair loss), autoimmune disorders, dyspareunia, hysterectomy, and other complications. Defendants failed in their post-market obligations to monitor and report these serious adverse events.

d. The Essure® website, print advertising and patient brochure stated "[t]he Essure® inserts stay secure, forming a long protective barrier against pregnancy. They also remain visible outside your tubes, so your doctor can confirm that they're properly in place" or words to that effect. However, the micro-inserts do not necessarily remain secure and can migrate and be expelled by the body, as evidenced by the multiple complaints concerning perforation that were inadequately monitored and reported by the Defendants.

e. The Essure® website, print advertising and patient brochure stated the "Essure® inserts are made from the same trusted, silicone free material used in heart stents" or words to that effect. However, the micro-inserts are not made from the same material as heart stents. Specifically, the micro-inserts are made of PET fibers that trigger inflammation and scar tissue growth. The PET fibers also degrade and leach carcinogens when in temperatures over 65 degrees, and the human body is at an average of 98 degrees, 33 degrees hotter than when degradation begins. Studies related to PET fiber degradation and leaching became increasingly available post-market, yet the Defendants never

warned about it or reconsidered safer alternative materials. Importantly, the PET fibers are not designed or manufactured for use in human implantation. Moreover, the PET fibers are made of the same materials as the PVT material in some vaginal meshes which have a high rate of expulsion. The Essure® inserts also contain nickel, which can cause severe reactions in patients. Like the PET fibers, studies became available post-market that put the Defendants on notice of the dangers of nickel to implanted women, yet the Defendants failed to adequately warn about it until it was too late for many women and failed to implement safeguards given this danger.

f. The Essure® website, print advertising, and patient brochure stated "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures." However, Essure® is not "surgery-free" and can cause women serious, life-altering complications including but not limited to debilitating pain, heavy bleeding necessitating medication and/or additional surgical procedures, allergic reactions (including but not limited to rashes, itching, bloating, swelling, headaches, and hair loss), autoimmune disorders, dyspareunia, hysterectomy, and other complications. Defendants failed in their post-market obligations to monitor and report these serious adverse events.

g. The Essure® website, print advertising, and patient brochure stated "Essure® is the most effective permanent birth control available-even more effective than tying your tubes or a vasectomy" or words to that effect. Yet, Defendants' SEC Form 10-K filing shows that Defendants never did a comparison to a vasectomy or tubal ligation. Defendants admitted, "We did not conduct a clinical trial to compare the Essure® procedure to laparoscopic tubal ligation."

h. The Essure® website claims "[c]orrect placement...is performed easily because of the design of the microinsert" or words to that effect. However, Defendants admitted that their own experts in hysteroscopy (as compared to general gynecologists not on the same level as an expert hysteroscopist) failed to place the micro-inserts in one out of seven clinical participants. Moreover, Defendants fail to warn of the dangers associated with the hysteroscopic procedure, a necessary part of implantation of the device.

i. The Essure® physician training manual states "[t]he PET fibers are what caused the tissue growth," and Essure® "works with your body to create a natural barrier against pregnancy" or words to that effect. However, during the PMA meeting with the FDA in 2002, Defendants represented that the trauma caused by the expanding coil striking the fallopian tubes is what causes the inflammatory response of the tissue, indicating the dangerous PET fibers are entirely unnecessary.

44. Doctors and patients, including Plaintiff and her implanting physicians, relied on these misrepresentations by Defendants.

45. Defendants advertised, promoted, and marketed on their websites, in print and/or video advertisements, brochures, and fact sheets the following statements about physicians performing the Essure® procedure, while failing to report the actual material facts:

a. "An Essure® trained doctor inserts spring-like coils, called micro-inserts" and "[p]hysicians must be signed-off to perform Essure® procedure" or words to that effect. However, Defendants failed to adequately train the implanting physician and "signed-off" on implanting physicians who did not have the requisite training.

b. The "Essure® training program is a comprehensive course designed to provide information and skills necessary to select appropriate patients, perform competent procedures and manage technical issues related to the placement of Essure® micro-inserts for permanent birth control" or words to that effect. However, Defendants failed to adequately train the implanting physician; "[i]n order to be trained in Essure® you must be a skilled operative hysteroscopist. You will find the procedure easier to learn if you are already proficient in operative hysteroscopy and management of the awake patient. If your skills are minimal or out of date, you should attend a hysteroscopy course before learning Essure®" or words to that effect. However, Defendants "signed off" on physicians who were not skilled operative hysteroscopists in order to monopolize and capture the market, including the implanting physician, and often utilized sales representatives to "train" physicians.

c. "In order to be identified as a qualified Essure® physician, a minimum of one Essure®

Case 3:16-cv-03369-WHA Document 1-1 Filed 06/16/16 Page 19 of 82

procedure must be performed every 6-8 weeks" or words to that effect. However, Defendants "signed off" on "Essure® physicians" who did not perform the procedure every 6-8 weeks.

46. Doctors and patients, including Plaintiff and her implanting physicians, also relied on these omissions and/or misrepresentations by Defendants.

47. In its CPMA, the FDA explicitly declined to approve any warranties made by Defendants, such as those set forth herein, stating: "CDHR does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."

48. The Defendants conduct not only violated its federal regulatory duties and its duties under California law, but also caused a massive failure of information that has to be present in the medical and scientific community to protect a patient's interest. Because the Defendants failed to timely, completely, or accurately report their knowledge of the risks and complications associated with the Essure® device, the public's knowledge of the risks associated with the Essure® device were seriously hampered and delayed. This endangered patient safety, including Plaintiff's safety.

49. As the FDA continued to force Defendants to provide additional information known to them that had been withheld, more information belatedly was made known to the medical community, including information concerning the frequency, severity and permanence of complications associated with the prescription and implementation of the Essure® device.

50. This belated and untimely release of relevant and important information lead to an increasing number of adverse events being reported to the FDA about Essure® from patients and physicians.

51. On September 24 and 25, 2015, the FDA convened a public hearing concerning the safety and efficacy of the Essure® device. At that public hearing, Defendants continued to misrepresent the safety and efficacy of Essure®:

a. Defendants testified that the efficacy rates for Essure® are 99.6%. In reality, studies show that the chances of becoming pregnant with Essure® are higher than with tubal ligations and higher than the rates reported by Bayer to the FDA at the public hearing.

b. Defendants testified that skin patch testing is not a reliable predictor of clinically

significant reactions to nickel-containing implantable devices, including Essure®. Despite this, Bayer told physicians and patients that a nickel sensitivity test was sufficient to determine whether a patient was a suitable candidate for an Essure® device.

c. Defendants testified that Essure® was an alternative to laparoscopic tubal ligation and that Essure® is a safe and effective method of permanent birth control. In reality, studies show that the chances of becoming pregnant with Essure® are higher than with tubal ligations, and Essure® patients are much more likely to require additional surgeries to correct complications associated with the sterilization procedure.

d. Defendants testified that most of the reports of adverse events to the FDA have come from consumers and not Defendants, which is unusual. In reality, Defendants failed to report thousands of the complaints of adverse events that it had received.

52. Defendants' conduct violated the Essure® CPMA, parallel state laws regarding post-marketing conduct, and the FDA post-marketing regulations, which ultimately prevented Plaintiff, physicians, and the public from understanding the true nature of Essure®'s adverse events, risks and ineffectiveness.

## FDA REQUIRES BLACK BOX WARNING FOR ESSURE®

53. On February 29, 2016, the FDA announced "actions to provide important information about the risks of using Essure® and to help women and their doctors be better informed of the potential complications associated with" the device. The FDA took the following actions:

a. The FDA is requiring a black box warning on Essure® to warn doctors and patients of "reported adverse events, including perforation of the uterus and/or fallopian tubes, intra-abdominal or pelvic device migration, persistent pain, and allergy or hypersensitivity reactions." The FDA draft guidance black box warning for Essure® also warns: "Some of these reported events resulted in device removal that required abdominal surgery. This information should be shared with patients considering sterilization with the Essure device during discussion of the benefits and risks of the device."

b. The FDA is requiring Defendants to implement a Patient Decision Checklist "to help to ensure women receive and understand information regarding the benefits and risks" of Essure®. The FDA's draft Patient Decision Checklist is a five-page document that the

physician will discuss with each patient interested in using the device. The patient must initial after each topic of discussion, and both the physician and patient must sign the document. The topics for discussion include, *inter alia*, the risks for "adverse events including persistent pain, device puncture of the uterus and/or fallopian tubes ('perforation'), or movement of the device into the abdomen or pelvis ('intra-peritoneal migration')"; "allergy or hypersensitivity reactions"; symptoms such as changes in skin (rash, itching), "chest pain, palpitations, breathing difficulties or wheezing, and intestinal discomfort such as nausea, diarrhea, and vomiting"; "joint or muscle pain, muscle weakness, excessive fatigue, hair loss, weight changes, and mood changes"; the fact that "there is no reliable test to predict ahead of time who may develop a reaction to the device"; the possibility that the Essure® device "can move after placement," possibly becoming ineffective at preventing pregnancy or leading to "serious adverse events such as bleeding or bowel damage, which may require surgery to address"; and the fact that if the Essure® device has to be removed after placement, it will require surgery to remove and possibly a hysterectomy.

c. The FDA has also ordered Bayer "to conduct a new postmarket surveillance study designed to provide important information about the risks of the device in a real-world environment." The study must provide data on "the risks associated with Essure and compare them to laparoscopic tubal ligation. This includes the rates of complications including unplanned pregnancy, pelvic pain and other symptoms, and surgery to remove the Essure device. The study will also evaluate how much these complications affect a patient's quality of life. . . . The FDA will use the results of this study to determine what, if any, further actions related to Essure are needed to protect public health."

54. Unfortunately, this new warning, labeling, and patient decision checklist came too late to warn Plaintiff of the true risks of Essure®. Had the Defendants complied with their federal regulatory duties and their duties under California law by warning about and reporting the known risks and complications in a timely fashion, the Plaintiff and her physicians would have had this relevant, critical information available to them before the implant of the Essure® device.

## VII. DEFENDANTS WERE AWARE OF DEFECTS AND SERIOUS ADVERSE EVENTS ASSOCIATED WITH ESSURE® AND FAILED TO COMPLY WITH THE FDA AND OTHER REGULATIONS VIOLATING CALIFORNIA STATE LAW

55. Defendants have a duty under California law to exercise reasonable care in warning Plaintiff and/or Plaintiff's physicians about the dangers of Essure® that were known or knowable to Defendants at the time of distribution. Defendants also have a post-market duty to monitor and report adverse events and risks associated with its device.

56. Despite the fact that evidence existed that the use of Essure® was dangerous and likely to place users at serious risk to their health, Defendants failed to disclose and warn of the health hazards and risks associated with Essure®. Instead, Defendants marketed, advertised, and promoted Essure® while failing to monitor, warn, or otherwise ensure the safety and efficacy of its users in violation of California state law and FDA regulations.

57. The FDA's Office of Regulatory Affairs ("ORA") is the lead office for all field activities, including inspections and enforcement. During an inspection, ORA investigators may observe conditions they deem to be objectionable. These observations are required to be listed on an FDA Form 483 when the observed conditions or practices indicate that an FDA-regulated product may be in violation of FDA requirements.

58. FDA Form 483s typically are discussed with a company's management team at the conclusion of the inspection. The Form 483 is not an all-inclusive list of every possible deviation from law and regulation. There may be other objectionable conditions that exist that are not cited on the FDA Form 483. Companies must take corrective action to address the cited objectionable conditions and any related non-cited objectionable conditions that exist.

59. The FDCA requires medical device manufacturers like Defendants to maintain and submit information as required by FDA regulation, 21 U.S.C. § 360i, including submitting Adverse Reaction Reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and event reports, 21 C.F.R. § 820.198(a). Specifically, 21 C.F.R. § 803.50 requires a manufacturer to report information no later than 30 days after it is received, from any source, if that information suggests that the device may have contributed to a serious injury, or has malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

Case MDL No. 2739 Document 1-1 Filed 07/21/16 Page 23 of 82

60. The FDA publishes the adverse events and MDRs in a public, searchable database called MAUDE and updates the report monthly with "all reports received prior to the update." The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices. *See* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.cfm

61. Defendants have a duty under California law to exercise reasonable care in warning Plaintiff and/or Plaintiff's physicians about the dangers of Essure® that were known or knowable to Defendants at the time of distribution. Defendants here failed to do so.

62. Defendants also have a duty under California law to exercise reasonable care in the manufacture, development, marketing, labeling, distributing, and sale of Essure® after it was approved for sale by the FDA in 2002. Defendants here failed to do so.

63. Defendants also had the obligations and the ability under federal regulations to maintain labeling that provides adequate warnings about risks and instructions for use; to ensure that the product was manufactured utilizing Good Manufacturing Practices; to conduct prompt, accurate and thorough post-market surveillance; to take action to ensure that the device can be used safely in accordance with the instructions; to maintain quality controls to adeqautely address, investigate, and assess manufacturing issues that arise from the device; and to ensure that any labeling, warranties, or representations Defendants made were not false or misleading in any respect. Defendants here failed to do so.

64. In July 2002, FDA inspectors issued a Form 483 to Defendants, reporting that certain adverse events were not captured in the data submitted for Essure®'s PMA.

65. In June and July 2003, the FDA conducted a six-day inspection of Conceptus' San Carlos headquarters.

66. During the six-day inspection, the FDA documented two conditions which it found objectionable and/or constituted violations of the FDCA and related Acts.

67. The two objectionable conditions were communicated to Conceptus by the FDA via a Form 483 dated July 7, 2003, and included: (1) Conceptus' failure to analyze all data from quality sources to identify existing and potential causes of nonconforming product- such as rejection of raw materials and subassemblies- and other quality problems related to the Essure® device; and (2) Conceptus' failure to follow procedures to control products that do not conform to specifications. These failures contribute to

manufacturing defects in the product.

68. Defendants' conduct violated the conditions of the Essure® CPMA, parallel state laws governing the post-marketing conduct of Conceptus, and FDA regulations including, but not limited to, 21 C.F.R. §§ 820.90, et seq.; 21 C.F.R. §§ 814, et seq.; 21 C.F.R. § 820.198 and §§ 820.100, et seq.; 21 C.F.R. §§ 820.70, et seq.; 21 C.F.R. §§ 820.184, et seq.; and 21 C.F.R. § 820.30.

69. After obtaining its CPMA, Conceptus became aware of potential quality and failure modes associated with the Essure® device. For example, Conceptus became aware that the following failures can occur with the device and lead to adverse consequences for patients:

a. the stainless steel used in Essure® can become un-passivated, which allows it to rust and degrade;

b. the nitinol can have a nickel rich oxide, which the body attacks;

c. the "no lead" solder can in fact have trace lead in it;

d. the Galvanic action between the metals used to manufacture Essure®, which causes the encapsulation of the product within the fallopian tubes, can be a continuous irritant to some patients;

e. the nitinol in the device can degrade due to High Nickel Ion release, increasing the toxicity of the product for patients;

f. latent manufacturing defects, such as cracks, scratches, and other disruption of the smooth surface of the metal coil, may exist in the finished product, causing excess nickel to leach into the surrounding tissues after implantation;

g. PET fibers degrade at 65 degrees, therefore considerable degradation is expected at 98 degrees in the human body and degradation products of the PET used in the implant can be toxic to patients, inciting both chronic inflammation and possible autoimmune issues; and

h. the mucosal immune response to nickel is different than the immune response in non-mucosal areas of the body.

70. Upon obtaining knowledge of these potential device failure modes, Defendants were required under the Essure® CPMA, 21 C.F.R. §§ 820.30, et seq., 21 C.F.R. §§ 820.100, et seq., and the FDA

Case 3:16-cv-03369-WHA Document 1-1 Filed 06/16/16 Page 25 of 82

Recognized Consensus Standard ISO 14971, to use this information to routinely update the risk analyses for the Essure® device and take any and all Corrective Action and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues. Furthermore, Defendants were required to establish QMS procedures to assess potential causes of non-conforming products and other quality problems with the product, such as latent manufacturing defects. 21 C.F.R. §§ 820.70, et seq.; 21 C.F.R. §§ 820.30, et seq. Lastly, Defendants were required to take necessary action- such as filing PMA Supplements, unilaterally updating their labeling through the CBE Process, and/or timely submitting MDRs- to advise users of Essure® of the defects and risks described above. Defendants failed to comply with each and every one of these FDA regulations and its duties under California state law, thereby jeopardizing the health of patients.

71. In November or December 2005, Conceptus moved its manufacturing facility from San Carlos, California to Mountain View, California. It did not file the requisite PMA Supplement to advise the FDA of the change in manufacturing site in violation of its post-marketing duties under 21 C.F.R. § 814.39.

72. On June 10 and 11, 2008, the California Department of Public Health, Medical Device Safety Section ("CDPH"), conducted an inspection of Conceptus' 331 East Evelyn Avenue location in Mountain View, California.

73. During this inspection the CDPH issued a Notice of Violation to Conceptus for: (1) failing to obtain a valid license to manufacture medical devices after Conceptus moved from its previous location in 2005; and (2) failing to maintain its procedure for inventory transfer.

74. This conduct by Defendants violated the conditions of the Essure® CPMA.

75. This conduct violated parallel California state laws governing the post-marketing conduct by Conceptus.

76. This conduct violated FDA regulations including, but not limited to, 21 C.F.R. § 814.39 and 21 C.F.R. §§ 820.70, et seq.

77. On or about December 2010, the FDA conducted a fifteen-day "For Cause" inspection. The purpose of the inspection was to investigate a specific problem that had come to the FDA's attention.

78. During the fifteen-day "For Cause" inspection, the FDA noted conditions that it found

objectionable and/or constituted violations of the FDCA and related Acts. The objectionable conditions were communicated to Conceptus by the FDA via a Form 483 dated January 6, 2011, and included:

a. Conceptus' failure to submit MDR determinations to the FDA within 30 days for reports of a serious injury involving the Essure® device, including but not limited to two reports of bowel perforation, and one report of pain and the Essure® device breaking into pieces immediately following implant, and 41 complaints that involved perforation of the uterus or fallopian tubes;

b. Conceptus' failure to submit MDR's to the FDA within 30 days for reports of a serious injury involving the Essure® device, including but not limited to five reports of the Essure® coils perforating the fallopian tubes and penetrating the peritoneal cavity;

c. Conceptus' failure to submit MDR's to the FDA reports of perforation with a post-procedural radiograph (HSG or CT) showing a coil in the abdominal or peritoneal cavity;

d. Conceptus' failure to include perforation of the Essure® micro-coil insert into the peritoneal cavity in its Design Failure Mode Effects Analysis (DFMEA) for Essure®, despite having documented at least 508 complaints of perforation involving the Essure® device;

e. Conceptus' failure to submit MDR's to the FDA for reports of the device failing to function as specified in the PMA and would be likely to cause or contribute to serious injury; and

f. Conceptus' failure to adequately document in a CAPA an incident involving the erroneous use of uncertified material by Conceptus' contract manufacturer in a validation protocol.

79. The FDA Establishment Inspection Report for the inspection that ended on January 6, 2011 states the following:

a. "My inspection of the complaint system of Conceptus Inc. found that the firm was not reporting complaints of loose micro-insert coils in the peritoneal or abdomino-pelvic cavity (See FDA483 Observation #2). . . . In some of these cases the micro-insert coil will migrate through the perforation in the tube and will be found on x-ray to be outside

the female reproductive tract in the peritoneal cavity. Such cases will be reported as MDR by the firm if the patient is complaining of pain and a second procedure is required to remove the coil. However, the firm will not report such complaints if an abdominal located coil is removed during a laparoscopic tubal ligation performed because of failure of the Essure procedure."

b. During this inspection, Conceptus gave the FDA inspector "an Excel spreadsheet with all of the complaints opened since Jan. 1, 2008 [and] there were 16,581 complaint[s] from 1/1/08 until 12/6/10 listed. There were 182 MDRs reported in the same time period."

c. Conceptus also gave the FDA inspector a more detailed complaint spreadsheet "that starts at 7/20/2010 and goes to 12/10/2010. That spreadsheet [had] a total of 2,752 complaints."

d. The FDA inspector looked at the complaints for perforation and noted that "none of the perforation complaints were reported as MDRs."

80. The FDA inspector specifically advised Defendants that any instances of the device migrating to, perforating, or penetrating areas in the body outside of the fallopian tubes (its intended permanent placement) constituted a malfunction and should be reported.

81. Defendants' actions set forth above violated the conditions of the Essure® CPMA.

82. Defendants' actions violated parallel state laws governing the post-marketing conduct of Conceptus.

83. Defendants' actions violated FDA Regulations, including, but not limited to, 21 C.F.R. §§ 803.50, et seq.; 21 C.F.R. §§ 814, et seq.; 21 C.F.R. §§ 820.30, et seq.; and 21 C.F.R. § 820.198 and §§ 820.100, et seq.

84. In May and June 2013, the FDA conducted another inspection that included an evaluation of Conceptus'/Bayer's complaint handling and adverse event reporting practices. As part of the inspection process, the FDA requested a complete list of complaints since January 2011. Defendants provided the FDA inspector with a spreadsheet containing 16,047 complaints Conceptus received on the Essure® device between January 2011 and the date of the inspection, only 183 of which were reported by Defendants to the FDA as MDRs.

85. The inspector reviewed 29 random complaint forms received by Defendants. All of the randomly

reviewed complaints in which one or more coils were imaged outside of the fallopian tubes, none were reported to the FDA as MDRs.

86. Upon information and belief, from January 1, 2008 through May 2013, Defendants were receiving on average over 15 complaints per day about their product, and thousands of complaints each year. Defendants timely reported only a tiny fraction of these complaints to the FDA.

87. Defendants' actions violated the conditions of the Essure® CPMA, parallel state laws governing the post-marketing conduct of Conceptus and FDA Regulations.

88. Defendants had unique knowledge concerning the frequency, severity and permanence of the complications and risks associated with the Essure® device. Despite this unique knowledge, Defendants failed to take necessary action- such as filing PMA Supplements, unilaterally updating its labeling through the CBE Process, or timely submitting MDRs- to advise users of Essure® of the defects and risks described above, violating California state law.

89. Defendants' actions violated the conditions of the Essure® CPMA and federal regulations and requirements governing the post-marketing conduct of Defendants, including, but not limited to, 21 C.F.R. § 814.39(d). Defendants' actions also separately violated duties under California law governing their post-market conduct.

90. Conceptus also failed to timely submit Post-Approval Studies under the Essure® CPMA. For example, the six month report was due on August 24, 2012 but was not received by the FDA until December 14, 2012. Other reports were likewise untimely.

91. Defendants' actions violated the conditions of the Essure® CPMA, parallel state laws governing the post-marketing conduct of Conceptus and FDA Regulations, including, but not limited to, 21 C.F.R. §§ 814.80, et seq.

92. The FDA also requires that upon purchase of a company holding a CPMA, the CPMA sponsor "must submit a PMA amendment to notify the FDA of the new owner... The... supplement should include: the effective date of the ownership transfer; a statement of the new owner's commitment to comply with all the conditions of approval applicable to the PMA; and either a statement that the new owner has a complete copy of the PMA including all amendment, supplements, and reports or a request for a copy from the FDA files."

93. However, no PMA supplement notifying the FDA of Conceptus' (and the Essure® CPMA's) change of ownership after Conceptus was acquired by Defendants was submitted. These actions violated the conditions of the Essure® CPMA and federal regulations and requirements governing the post-marketing conduct of Conceptus, including, but not limited to, 21 CFR §§ 814.39 et seq. Defendants' actions also separately violated duties under California law governing their post-market conduct.

94. As presented above, Defendants failed to comply with several of the aforementioned conditions of the CPMA and FDA regulations, thereby invalidating the CPMA.

95. By failing to update their labeling as new post-marketing information became available to ensure that its labeling remained both accurate and adequate, Defendants also rendered Essure® a "misbranded" device under the FDCA and thus not allowed to be marketed. These actions also violated parallel state laws governing Defendants' marketing representations and warnings. Despite this, Defendants continued to improperly market Essure® for use in women, includng the Plaintiff, at a time that they were prohibited from doing so under Federal law. Defendants' actions separately violated duties under California law governing their post-market conduct.

96. By failing to comply with several CPMA conditions and FDA post-marketing regulations prior to implant into Plaintiff, Essure® was also considered to be an "adulterated" device under § 501(f) of the FDCA and not allowed to be marketed. 21 U.S.C. § 351(h); 21 C.F.R. §§ 814.80, et seq. However, Defendants continued to market Essure®. Despite this, Defendants continued to improperly market Essure® for use in women, includng the Plaintiff, at a time that they were prohibited from doing so under Federal law. Defendants' actions separately violated duties under California law governing their post-market conduct.

97. Defendants' failure to timely file MDR's and to report to the FDA the complaints that were not addressed by the device's labeling and/or complaints that were occurring with an unexpected increase in severity and frequency, which it knew of from the more than 32,000 complaints that it received, violated the CPMA, FDA post-marketing regulations, and parallel state law. Defendants' violations prevented Plaintiff, her physicians, and the public from understanding the true nature of Essure®'s adverse events, risks, and ineffectiveness.

98. Defendants did not provide any true medical training to physicians prior to selling their products, including Plaintiff's implanting physicians. Instead, the training consisted of a printed manual and guidance / instruction from sales representatives who did not have any formal medical training.

99. Contrary to Defendants' representations, there was no meaningful Essure® training program provided to, let alone required for, prospective implanting physicians, including Plaintiff's physicians, to complete prior to selling its Essure® system. Defendants sold its Essure® system without regard to physicians' knowledge, training, or experience with hysterocopes and the Essure® system itself, including, but not limited to the Essure® Instructions for Use and Physician Training Manual.

100. Defendants' actions violated duties under California law governing their post-market conduct.

101. At all relevant times, Defendants' Essure® product was prescribed and used as intended by Defendants and in a manner reasonably foreseeable to Defendants.

102. Prescribing and implanting physicians, healthcare providers and patients, including Plaintiff and her healthcare providers, neither knew, nor had reason to know at the time of their use of Essure® of the existence of the aforementioned adverse events and defects. Ordinary consumers would not have recognized the potential risks or side effects which Defendants concealed and misrepresented through their promotion of Essure® as safe and effective for pregnancy prevention.

## VIII. PLAINTIFF'S HISTORY

103. On or about April of 2009, Ms. Scott presented to her OB/GYN, Samuel Milroy, M.D., to discuss getting her tubes tied. However, after that appointment, Ms. Scott decided to wait on the procedure.

104. Ms. Scott met with Dr. Milroy in early June of 2013 and he highly recommended Essure® to Ms. Scott as a form of permanent birth control, stating that it was better than tubal ligation and didn't require surgery, or words to that effect.

105. Dr. Milroy provided Ms. Scott with a brochure for the Essure® devices/procedure that stated that it involved a much shorter recovery time than a tubal ligation, was very effective at preventing pregnancy, and was lower risk than a tubal ligation, or words to that effect.

106. Ms. Scott relied on the representations made in the Essure® brochure and benefits and risks as relayed by Dr. Milroy in reaching her decision to have the Essure® procedure.

107. On or about June 6, 2013, Ms. Scott underwent the Essure® procedure, which was performed by Dr. Milroy at Complete Health Care for Women located at 5888 Cleveland Ave., Columbus, OH 43231.

108. Soon after the Essure® procedure, Ms. Scott began experiencing: severe, abnormal menstrual pain and cramping; severe lower abdominal/pelvic pain; and abnormal, heavy bleeding.

109. During her follow-up appointment, Ms. Scott discussed the symptoms she was experiencing with Dr. Milroy but he told her that it was normal to experience those symptoms after the procedure.

110. Because Dr. Milroy was unable to determine the cause of Ms. Scott's symptoms, she sought a second opinion with Dr. Cherie Richey in Columbus, Ohio in May of 2014.

111. Dr. Richey stated that Ms. Scott's symptoms were most likely related to the Essure® device and would require a full hysterectomy to resolve Ms. Scott's symptoms and her surgery was scheduled for the next month.

112. On June 20, 2014, Ms. Scott underwent a full hysterectomy performed by Dr. Milroy.

113. Ms. Scott was forced to take six weeks off from work to recover from this procedure, which was very painful and left her with permanent scars.

114. Following her full hysterectomy, all of Ms. Scott's Essure® related symptoms have resolved.

115. Plaintiff exercised reasonable diligence in investigating potential causes of her injury by discussing her injuries with healthcare providers. None of Plaintiff's conversations with her healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that the Essure® implanted in Plaintiff was defective.

## FIRST CAUSE OF ACTION

## NEGLIGENT FAILURE TO WARN

116. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

117. Defendants formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, advertised, manufactured, sold, distributed, marketed, and promoted Essure®, including the Essure® that was implanted into Plaintiff.

118. Defendants had a duty under California state law to exercise reasonable care to provide adequate warning about the risks and dangers of Essure® that were known or knowable to Defendants at the time

of distribution.

119. Defendants breached their duty in that they failed to warn Plaintiff and her physicians by not reporting the risk of serious defects and life-altering complications described herein that Defendants knew or should have known were associated with Essure® prior to the time of Plaintiff's implant, including failure to communicate adverse events similar to the injuries suffered by Plaintiff.

120. Specifically, Defendants breached these duties and violated federal and state law by, inter alia:

121. receiving and failing to warn of or report many of the approximately 16,000 complaints about Essure® to the FDA or the public; failing to warn of or report Essure®'s failure to meet its performance specifications or perform as intended under the CPMA and FDA requirements; and receiving and failing to warn or report to the FDA and the medical community their knowledge and information regarding complaints about Essure®, including but not limited to:

a. instances of perforation and/or penetration of the fallopian tubes;

b. instances of perforation and/or penetration of the uterus;

c. instances of perforation and/or penetration of the bowel;

d. instances of perforation and/or penetration of the abdominal cavity;

e. instances of perforation and/or penetration of the peritoneal cavity;

f. instances of chronic/persistent abdominal and pelvic pain/cramping;

g. instances of chronic/persistent irregular vaginal bleeding;

h. instances of the device internally separating or breaking into pieces; and

i. instances of adverse events/reactions requiring device removal.

122. Despite the fact that evidence existed that the use of Essure® was dangerous and likely to place users at serious risk to their health, Defendants failed to disclose and warn of the health hazards and risks associated with Essure®. Instead, Defendants marketed, advertised, and promoted Essure® while failing to warn or otherwise ensure the safety of its users in violation of California state law, the Essure® CPMA and FDA regulations.

123. In addition, the Essure® CPMA set forth specific reporting requirements -as described above- that obligated Defendants to report:

a. knowledge or information of any adverse reactions, side effects, injuries, toxicity, or

sensitivity reactions;

b. unanticipated adverse effects or increases in the frequency of anticipated adverse effects;

c. any knowledge or information of Essure®'s failure to meet device specifications established in the approved CPMA;

d. any changes to the performance of the device;

e. changes to the facility or establishment to manufacture, process, or package the device;

f. whenever there is use of a different facility or establishment to manufacture, process, or package the device;

g. any information from any source that reasonably suggests a device may have caused or contributed to serious injury; and

h. any information from any source that reasonably suggests a device has malfunctioned and would be likely to cause or contribute to serious injury if the malfunction were to recur.

124. Defendants negligently failed to comply with the above requirements and failed to take necessary actions- such as filing PMA Supplements, unilaterally updating its labeling through the CBE Process, or timely submitting MDRs- to advise users of Essure® of the defects and risks described above.

125. Defendants had the ability and the duty under state law to disclose its knowledge of adverse events to healthcare providers and the public to ensure its labeling and product were not misbranded.

126. Had Defendants timely and adequately reported the adverse events to the FDA, it would have effectively warned physicians, including Plaintiff's physicians, of those adverse events both directly and through discussion of those events that would have followed in the literature and at meetings. Thus, additional information would have been available to the public, including Plaintiff and/or Plaintiff's physicians, regarding the dangers of Essure® that were known or knowable to Defendants at the time of distribution.

127. In this case, once the medical community and the FDA became aware of the undisclosed adverse events, the FDA held a public hearing discussing the risks and benefits of the device and then required a black box warning and Patient Decision Checklist for Essure® that warns of many of the same injuries that Plaintiff has experienced due to Essure®.

128. Defendants' delay in timely reporting their known complications prevented the Plaintiff and her physicians from having timely information concerning the real life risks associated with the Essure® device. Had the Plaintiff received timely and adequate information of these serious risks and adverse events, they would not have agreed to the Essure® implant.

129. Defendants could have included this information in its labeling, physician use materials and patient pamphlets, which Plaintiff and her physicians reviewed and relied upon, but Defendants chose not to include it. In this case, once the medical community and the FDA became aware of the undisclosed adverse events, physicians began to study them further and published articles in well-respected medical journals. This information would have been available for review by Plaintiff and Plaintiff's physicians.

130. Indeed, if Plaintiff had been adequately warned of these serious risks and adverse events, she would not have agreed to the Essure® implant. As a proximate and legal result of Defendants' failure to comply with its CPMA and FDA post-marketing regulations, Defendants breached their duty of care to Plaintiff under state law and caused Plaintiff past and future suffering, including severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

131. WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

## SECOND CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY- INADEQUATE WARNINGS

132. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

133. In accordance with the California state law, Defendants owed the public, including Plaintiff, a duty to use reasonable care to provide adequate warnings reasonably necessary to advise users like Plaintiff and Plaintiff's doctors of any dangers inherent in the use of Essure® through timely reporting to the FDA and public. Defendants also had a post-market duty to monitor complaints and perform surveillance on its products, including, but not limited to, scientific literature related to the necessary component parts and materials utilized in Essure®.

134. Defendants failed to warn Plaintiff and her physicians of the risk of serious defects and life

altering complications described herein rendering the device defective and unreasonably dangerous.

135. Specifically, Defendants failed to: (a) report many of the roughly 16,000 complaints about Essure® to the FDA or the public; (b) report Essure®'s nonconformity with its performance specifications; and (c) update Essure®'s labeling or report to the FDA and the medical community their post-market information regarding complaints about Essure®. Defendants also failed to revise their labeling to warn of the accurate rate of occurrence of adverse events based upon the post-market adverse event information available to them.

136. Plaintiff's Essure® was defective at the time of its sale and distribution, and at the time it left the possession of Defendants, in that Defendants failed to adequately warn of the risks for migration, perforation, penetration, device breakage, removal, chronic abnormal bleeding and pain, autoimmune response, and other injuries involved in the use of Essure®. The accurate rate of occurrence for these and other injuries associated with the use of Essure® were not readily recognizable to the ordinary consumer, including Plaintiff and/or Plaintiff's physicians.

137. The Essure® was defective and unreasonably dangerous due to inadequate warnings and/or instruction because Defendants knew or should have known that the product created a serious risk of migration, perforation, penetration, autoimmune response, and other harm to consumers, and Defendants failed to adequately warn consumers of said risks- including Plaintiff and/or her healthcare physicians- in accordance with California state law.

138. The Essure® manufactured and sold by Defendants was defective and unreasonably dangerous due to inadequate warnings and instructions because Defendants knew or should have known that Essure® created, among other things, a higher than expected risk for adverse events, and Defendants failed to adequately warn of those risks, to monitor those risks, report them and update its labeling regarding such risks when the information became available.

139. At all relevant times, Defendants' Essure® was prescribed and used as intended by Defendants and in a manner reasonably foreseeable to Defendants.

140. The Essure® manufactured, marketed, promoted, and sold by Defendants was expected to, and did, reach Plaintiff without substantial change to the condition in which it was sold.

141. Despite the fact that evidence existed that the use of Essure® was unreasonably dangerous and

likely to place users at serious risk to their health, Defendants failed to monitor and warn of the defects, health hazards and risks associated with Essure®.

142. At all times relevant to this action, the dangerous propensities of Essure® were known to Defendants or were reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the device, and not known to ordinary physicians who would be expected to prescribe and implant Essure® for their patients.

143. Defendants knew that physicians and other healthcare providers began commonly prescribing this product as a safe and effective contraceptive device despite its potential for serious severe and permanent side effects.

144. Defendants were required to provide adequate warnings to consumers and the medical community under federal and California state law, but failed to do so in a timely and responsibly manner.

145. Had Defendants timely and adequately reported the adverse events to the FDA, it would have effectively warned physicians, including Plaintiff's physicians, of those adverse events both directly and through discussion of those events that would have followed in the literature and at meetings. Thus, additional information would have been available to the public, including Plaintiff and/or Plaintiff's physicians, regarding the dangers of Essure® that were known or knowable to Defendants at the time of distribution.

146. In this case, once the medical community and the FDA became aware of the undisclosed adverse events, the FDA held a public hearing discussing the risks and benefits of the device and then required a black box warning and Patient Decision Checklist for Essure® that warns of many of the same injuries that Plaintiff has experienced due to Essure®.

147. Defendants' delay in timely reporting their known complications prevented the Plaintiff and her physicians from having timely information concerning the real life risks associated with the Essure® device. Had the Plaintiff received timely and adequate information of these serious risks and adverse events, she would not have agreed to the Essure® implant.

148. Essure®, which was manufactured, distributed, tested, sold, marketed, promoted, advertised, and represented defectively by Defendants, was a substantial contributing factor in bringing about

Plaintiff's injuries which would not have occurred but for the use of Essure®.

149. The defective warnings were a substantial contributing factor in bringing about the injuries to Plaintiff that would not have occurred but for the use of Essure®.

150. As a proximate result of the Essure®'s defective condition at the time it was sold, Plaintiff suffered and will continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

151. By reason of the foregoing, Plaintiff has been damaged by Defendants' wrongful conduct. Defendants' conduct was willful, wanton, reckless, and, at the very least arose to the level of gross negligence so as to indicate a disregard of the rights and safety of others, justifying an award of punitive damages.

152. WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

## THIRD CAUSE OF ACTION

## NEGLIGENCE / NEGLIGENCE *PER SE*

153. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

154. Under federal law and regulations, Defendants were under a continuing duty to comply with the requirements listed in their CPMA and with the FDCA in the manufacture, development, promotion, marketing, labeling, distribution, and sale of Essure®. See Essure® CPMA; 21 U.S.C. ch. 9 §§ 301, et seq.

155. Violations of the following federal regulations also constitute violations of Defendants' state law duties and give rise to negligence per se: 21 C.F.R. § 803.10; 21 C.F.R. § 803.50; 21 C.F.R. § 803.52; 21 C.F.R. §803.53; 21 C.F.R. § 803.56; 21, C.F.R. § 806; 21 C.F.R. § 814.1; 21 C.F.R. § 814.3; 21 C.F.R. § 814.9; 21 C.F.R. § 814.20; 21 C.F.R. § 814.37; 21 C.F.R. § 814.39; 21 C.F.R. § 814.80; 21 C.F.R. § 814.82; 21 C.F.R. § 814.84; 21 C.F.R. § 820.5; 21 C.F.R. § 820.20; 21 C.F.R. § 820.22; 21 C.F.R. § 820.25; and 21 § C.F.R. 820.70.

156. Plaintiff is within the class of persons the statutes and regulations protect and Plaintiff's injuries are of the type of harm these statutes and regulations are to prevent.

157. Defendant's violations of these statutes and regulations proximately caused Plaintiff's injuries alleged herein.

158. The conditions of the Essure® CPMA incorporate these statutes and regulations. Failure to comply with the conditions of approval invalidates the CPMA. See 21 C.F.R. § 814.82(c).

159. Defendants had a parallel duty under California law to exercise reasonable care in testing and inspecting their product, in monitoring the design of the Essure® placed into Plaintiff, in performing continuing risk-analysis and risk assessments of Essure®, in manufacturing Essure®, and in marketing Essure® to the public. Defendants also undertook a duty to certify and train physicians on the proper implantation of the device.

160. Defendants were negligent under California state law in their development, promotion, marketing, manufacture, distribution, and/or sale of Essure® in one or more of the following particulars:

a. manufacturing actual Essure® devices that differ from the specifications set forth in the CPMA, its Supplements, the Conditions of Approval and/or other federal regulations;

b. failing to conduct regular risk analysis of its Essure® device, including a Design Failure Analysis, and failing to include and consider known complications from the device as part of its risk analysis processes;

c. in failing to properly meet the applicable standard of care by not complying with applicable federal regulations;

d. carelessly and negligently selling and distributing Essure® in violation of the CPMA and federal law;

e. negligently incorporating components into Essure® that could not stand up to normal usage;

f. failing to exercise reasonable care in its inspecting and testing of the product;

g. failing to exercise reasonable care in its manufacturing and quality control processes; and

h. failing to exercise reasonable care to appropriately certify and train physicians on prescribing and implantation of the device.

161. Despite the fact that Defendants knew or should have known that Essure® caused unreasonable, dangerous side effects, Defendants continued to promote and market Essure® to consumers, including

Case MDL No. 2739 Document 1-1 Filed 07/21/16 Page 39 of 82

Plaintiff and her healthcare providers.

162. Defendants also had a duty under California state law to exercise ordinary care in the manufacture of Essure® consistent with FDA specifications, the Essure® CPMA, and/or conditions of approval.

163. Defendants negligently failed to manufacture Essure® consistent with FDA specifications, the Essure® CPMA, and/or conditions of approval.

164. Defendants were cited by the FDA for, inter alia:

a. erroneously using non-conforming material in the manufacturing of Essure®;

b. failing to use pre-sterile and post-sterile cages;

c. manufacturing Essure® at an unlicensed facility;

d. manufacturing Essure® for three years without a license to do so;

e. failing to analyze or identify existing potential causes of non-conforming product and other quality problems;

f. failing to track non-conforming product;

g. failing to follow procedures used to control products which did not conform to specifications;

h. failing to have a complete Design Failure Analysis; and

i. failing to document CAPA activities for a supplier correction action.

165. Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of Essure®.

166. Defendants further had a duty to ensure the physicians using the Essure® system were adequately trained, including on the use of the hysteroscopic equipment necessary for implantation of the device.

167. Defendants advertised, promoted, and marketed on their websites, in print and/or video advertisements, brochures, and fact sheets that Essure® placement procedures were to be performed by doctors who were specifically trained, tested, certified, and authorized by Defendants to do so.

168. Only doctors authorized by Defendants were permitted to perform Essure® placement procedures.

169. As described above, Defendants negligently failed to adequately train implanting physicians in the implantation procedure, negligently certified/authorized implanting physicians who did not have the requisite training, failed to adequately train implanting physicians in hysteroscopy, and failed to ensure that certified/ authorized implanting physicians performed the procedure as frequently as required to maintain their certification/authorization by Defendants.

170. Upon information and belief, physicians were incentivized to purchase Essure® by Defendants' distribution of free hysteroscopic equipment valued at approximately $20,000 to physicians that purchased twenty five Essure® kits. And while the hysteroscopic equipment was required to implant the device, the Defendants never provided a training manual or appropriate training for use of the hysteroscope.

171. Lastly, Defendants negligently failed to adequately train Defendants' employees who provided recommendations and advice to physicians who implanted the device.

172. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

173. Had Defendants exercised ordinary care, and complied with the then existing standards of care, Plaintiff would not have been injured.

174. As a proximate and legal result of Defendants' failure to exercise reasonable care and the resulting defective condition of Essure®, the Essure® coils implanted into Plaintiff caused her to suffer severe, abnormal menstrual pain and cramping; severe lower abdominal/pelvic pain; and abnormal, heavy bleeding, necessitating that Plaintiff undergo a painful full hysterectomy that left her with permanent scars. Plaintiff suffered and will continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which they are entitled to compensatory and other damages in an amount to be proven at trial.

175. WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

## FOURTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

176. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

177. Defendants expressly warranted Essure® to be safe for use by the general public, including Plaintiff and/or her healthcare providers.

178. Defendants also expressly warranted that Essure® was safer and more effective than other permanent methods of birth control, such as tubal ligation.

179. Defendants' express warranties as described in the foregoing section, "Defendants Engaged in False and Misleading Sales and Marketing Tactics," were specifically negotiated and expressly communicated to Plaintiff in such a manner that Plaintiff understood and accepted them.

180. Defendants' affirmations of fact or promise and descriptions of Essure® as described in the foregoing section, "Defendants Engaged in False and Misleading Sales and Marketing Tactics," regarding Essure® created a basis of the bargain for Plaintiff and/or her physicians.

181. At the time of the making of the express warranties, Defendants had knowledge of the purpose for which Essure® was to be used and warranted the same to be in all respects fit, safe, effective, and proper for such purpose. Essure® was unaccompanied by adequate warnings of its dangerous propensities and lack of effectiveness that were either known or knowable to Defendants at the time of distribution and sale.

182. Defendants' breaches of their express warranties under state law parallel their violations of federal law; the Essure® CPMA specifically mandates, and California state law independently requires, that any warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.

183. In its CPMA, the FDA explicitly declined to approve any warranties made by Defendants, such as those set forth herein, stating: "CDHR does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."

184. Plaintiff and/or her healthcare providers reasonably relied upon the skill and judgment of Defendants, and upon said express warranties, in using Essure®. The warranties and representations were untrue in that Essure® was unsafe and unsuited for the use for which it was intended.

185. As soon as the true nature of Essure® and the fact that the warranties and representations were false was ascertained, Defendants were on notice of the breach of said warranties.

186. As a proximate result of Defendants' warranties and Plaintiff's reliance on same, Plaintiff has suffered and continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

187. WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

## FIFTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

188. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

189. Defendants owed a duty in all of its several undertakings, including the communication of information concerning Essure®, and to exercise reasonable care to ensure that they did not, in those undertakings, create unreasonable risks of personal injury to others.

190. Defendants, in the course of its business profession, knowingly and negligently disseminated information to physicians concerning the properties and effects of Essure®, with the intent and expectation that physicians would rely on that information in their decisions in recommending and prescribing Essure® for their patients.

191. When Defendants disseminated information to physicians and/or patients concerning the properties and effects of Essure®, they knew or should have known that physicians and/or patients would reasonably rely on that information in their decisions concerning the use of Essure®.

192. Defendants disseminated false information, as described in the foregoing section, "Defendants Engaged in False and Misleading Sales and Marketing Tactics," to physicians, the medical community, and the public with knowledge that the information was, in fact, false and misleading.

193. Defendants made misrepresentations which are specifically outlined in the foregoing section, "Defendants Engaged in False and Misleading Sales and Marketing Tactics."

194. Defendants made these misrepresentations and concealed adverse information at a time when Defendants knew, or should have known, that Essure® had defects, dangers, and characteristics that were other than what Defendants had represented to consumers and the healthcare industry generally.

195. Defendants had no reasonable grounds for believing these representations were true when they

were made; in fact, Defendants knew the representations to be false.

196. Defendants' breach of their duties under state law parallel their violation of federal law; the Essure® CPMA specifically mandates, and state law independently requires, that any representations regarding the device must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.

197. Defendants disseminated the false information, as referenced above, to physicians, the medical community, and the public with the intention to deceive physicians and their patients and to induce the physicians to prescribe Essure®.

198. In willfully supplying the false and misleading information, Defendants negligently failed to exercise reasonable care to ensure that the information disseminated to physicians and patients concerning the properties and effects of Essure® was accurate and not misleading.

199. By failing to ensure representations regarding Essure® were truthful, accurate, and not misleading, Defendants have violated the Essure® CPMA, FDA regulations, and parallel state law.

200. Defendants expected or should have expected that patients, in reliance on false information, who were implanted with Essure® would be placed in unnecessary, avoidable, and unreasonable danger due to unwarranted exposure to Essure®.

201. Plaintiff and/or Plaintiff's physicians did in fact reasonably rely on Defendants' negligent misrepresentations, as Defendants intended.

202. Specifically, Plaintiff would have never had Essure® implanted had she been aware that there had been 16,047 complaints regarding Essure®, or the falsity of the representations specifically delineated in the preceding paragraphs.

203. As a proximate and foreseeable result of the foregoing misrepresentations by Defendants, Plaintiff suffered and will continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

204. WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

## SIXTH CAUSE OF ACTION

## FRAUD

205. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

206. At all times mentioned in this Complaint, Defendants had the duty and obligation to disclose to Plaintiff and/or her healthcare providers, the true facts concerning Essure®.

207. Defendants concealed material facts concerning Essure® from Plaintiff, her physicians, and other healthcare providers, including but not limited to the following:

a. Defendants received and fraudulently concealed 16,047 complaints regarding Essure® where pain was experienced by consumers. The FDA's Establishment Inspection Report on June 26, 2013 states: "the inspection found that the firm was not reporting as MDRs complaints in which their product migrated from the fallopian tube into the peritoneal cavity, the firm did not consider these complaints in their risk analysis for the design of their product, and the firm failed to document CAPA activities."

b. Defendants fraudulently concealed eight perforations which were caused by Essure® and which Defendants failed to disclose to Plaintiff, Plaintiff's healthcare providers, and the FDA. The FDA memorialized this concealment in its Investigative Report and Form 483 dated January 25, 2011, stating: "the firm had not properly evaluated eight complaints of peritoneal perforation for reporting to the FDA as an adverse event. Also, the firm's risk analysis did not include an evaluation of the risk associated with perforation of the peritoneal cavity."

c. On January 6, 2011, the FDA issued a violation to Defendants for not submitting timely MDR reports when it received information that reasonably suggested that Essure® "may have caused or contributed to a death or serious injury if the malfunction were to recur." This information included incidents regarding perforation of bowels, Essure® coils breaking into pieces, and Essure® coils migrating out of fallopian tubes. Defendants had notice of 168 perforations but only disclosed twenty-two to the FDA.

d. On January 6, 2011, the FDA cited Defendants for failing to document Corrective and

Preventive Action Activities. Specifically, the FDA found that there were failures in Defendants' design. In addition, Defendants' CAPA did not mention the non-conformity of materials used in Essure® or certain detachment failures, despite Defendants' knowledge of same.

208. As described above in paragraphs 40-53, Defendants made affirmative representations to Plaintiff and/or her physicians before Essure® was implanted in Plaintiff that Essure® was safe and effective- while concealing the material facts set forth herein- with the intent or purpose that Plaintiff, her physicians, and the healthcare industry would rely on them, leading to the use of Essure® by Plaintiff.

209. Defendants intentionally, willfully, and maliciously concealed and/or suppressed the facts set forth above from Plaintiff and her physicians, with the intent to defraud as alleged herein.

210. California Civil Code § 1709 provides that one who willfully deceives another with intent to induce her to alter her position to her injury or risk, is liable for any damages which they thereby suffer.

211. California Civil Code § 1710 provides, in part, that a deceit, within the meaning of § 1709, is the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; or the suppression of fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact.

212. Defendants willfully deceived Plaintiff, her healthcare providers, the medical community, and the public in general, by suggesting untrue facts about their product that they knew to be false or had no reasonable ground for believing to be true, and by concealing material information concerning Essure®, which Defendants had a duty to disclose.

213. At the time Essure® was manufactured, distributed, and sold to Plaintiff, Defendants were in a unique position of knowledge concerning the safety and effectiveness of Essure®, and thereby held a position of superiority over Plaintiff and her physicians.

214. Neither Plaintiff nor her healthcare providers were aware of the concealed and/or suppressed facts set forth herein. Had Plaintiff and/or her healthcare providers been aware of those facts, they would not have purchased and used Essure®, and Plaintiff would not have been injured as a result.

215. Plaintiff and her physicians justifiably relied on and/or were induced by Defendants' intentional misrepresentations and/or concealment. Specifically, Plaintiff would never have had the Essure® device implanted had she been aware that there were eight reports of perforations of human cavities or that there had been 16,047 complaints regarding Essure®.

216. It is reasonable that Plaintiff, her physicians, and the healthcare industry would rely on the statements of Defendants regarding whether Essure® was safe and effective because as the manufacturer, Defendants were held to the level of knowledge of an expert in the field.

217. Defendants had a duty to warn Plaintiff, her physicians, and the general public about the potential risks and complications associated with Essure® in a timely manner. Defendants also had a post-market duty to monitor, report and update its labeling to show the true safety and risk parameters of the device.

218. As a proximate result of the concealment and/or suppression of the facts set forth above, Plaintiff and her healthcare providers reasonably relied on Defendants' deception and, Plaintiff was implanted with Essure® and subsequently sustained injuries and damages as described herein. Defendants' concealment was a substantial contributing factor in causing Plaintiff's injuries.

219. As a result of the foregoing fraudulent and deceitful conduct by Defendants, Plaintiff seeks punitive damages according to proof.

220. As a result of the foregoing fraudulent and deceitful conduct by Defendants, Plaintiff suffered and will continue to suffer severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

221. WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth.

## REQUEST FOR PUNITIVE DAMAGES

222. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein and further alleges as follows:

223. At all times relevant herein, Defendants:

a. knew or should have known that Essure® was dangerous and ineffective;

b. concealed the dangers and health risks from Plaintiff, physicians, other medical

providers, the FDA, and the public at large;

c. attempted to misrepresent and did knowingly make misrepresentations to Plaintiff, her physicians, hospitals, other medical providers, and the public in general, as previously stated herein, as to the safety and efficacy of Essure®; and

d. with full knowledge of the health risks associated with Essure® and without adequate warnings of the same, manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, promoted, marketed, advertised, distributed, and sold Essure® for use.

224. Defendants, by and through its officers, directors, managing agents, authorized sales representatives, employees, and/or other agents who engaged in malicious, fraudulent, and oppressive conduct towards Plaintiff and the public, acted with willful, wanton, conscious, and/or reckless disregard for the safety of Plaintiff and the general public.

225. Defendants' misrepresentations include knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety of Essure®. Defendants' conduct was willful, wanton, and undertaken with a disregard for Plaintiff's rights.

226. Notwithstanding the foregoing, Defendants continued to market Essure® to consumers, including Plaintiff herein, without disclosing the risks.

227. Defendants knew of Essure®'s lack of warnings, but intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and sell Essure® without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Essure®.

228. Defendants' intentional and/or reckless failure to disclose information deprived Plaintiff of necessary information to enable her to weigh the true risks of using Essure® against its benefits.

229. As a direct and proximate result of one or more of these wrongful acts or omissions of Defendants, Plaintiff suffered profound injuries that required medical treatment and incurred medical and hospital expenses, for which Plaintiff has become liable.

230. Defendants are liable jointly and/or severally for all general, special and compensatory damages and equitable relief to which Plaintiff is entitled by law. Plaintiff seeks actual and punitive damages

from Defendants and allege that the conduct of Defendants was committed with knowing, conscious, careless, reckless, willful, wanton, deliberate, and grossly negligent disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

231. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorney's fees, and all such other relief as the Court deems appropriate pursuant to common law and statutory law.

## RELIEF REQUESTED

WHEREFORE Plaintiff prays for judgment against Defendants and, as appropriate to each cause of action alleged and as appropriate to the standing of Plaintiff, as follows:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;
2. for compensatory damages according to proof;
3. for declaratory judgment that Defendants are liable to Plaintiff for all evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical, and incidental expenses, costs, and losses caused by Defendants' wrongdoing;
4. for disgorgement of profits;
5. for an award of attorneys' fees and costs;
6. for prejudgment interest and the costs of suit;
7. punitive or exemplary damages according to proof; and
8. for such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated: May 16, 2016

By: ______________________
M. Elizabeth Graham, CA 143085
Jay W. Eisenhofer
Thomas V. Ayala

Samantha Mertz
Hilary Hochman
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Phone: (302) 622-7000 / Fax: (302) 622-7100
Email: egraham@gelaw.com
Email: jeisenhofer@gelaw.com
Email: tayala@gelaw.com
Email: smertz@gelaw.com
Email: hhochman@gelaw.com

Robert K. Jenner
JANET, JENNER & SUGGS, LLC
Commerce Centre East
1777 Reisterstown Road, Suite 165
Baltimore, Maryland 21208
Phone: (410) 653-3200 / Fax: (410) 653-9030
Email: rjenner@myadvocates.com

Kimberly Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, Massachusetts 02116
Phone: (617) 933-1265 / Fax: (410) 653-9030
Email: kdougherty@myadvocates.com

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
M. Elizabeth Graham, State Bar # 143805
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
TELEPHONE NO.: 302-622-7000 FAX NO.: 302-622-7137
ATTORNEY FOR (Name): Norma Scott

FOR COURT USE ONLY

ENDORSED
FILED
ALAMEDA COUNTY
MAY 16 2016
CLERK OF THE SUPERIOR COURT
By Sue Pesko
Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME:

CASE NAME:
Norma Scott v. BAYER CORP., et al

CASE NUMBER: RG16815918
JUDGE:
DEPT:

## CIVIL CASE COVER SHEET

[✓] Unlimited (Amount demanded exceeds $25,000)
[ ] Limited (Amount demanded is $25,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[✓] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [✓] Large number of separately represented parties
b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [✓] Substantial amount of documentary evidence
d. [✓] Large number of witnesses
e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary b. [✓] nonmonetary; declaratory or injunctive relief c. [✓] punitive
4. Number of causes of action (specify): 6
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: May 16, 2016
M. Elizabeth Graham
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.



Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

Case MDL No. 2739 Document 1-1 Filed 07/21/16 Page 52 of 82

*Unified Rules of the Superior Court of California, County of Alameda*

F. ADDENDUM TO CIVIL CASE COVER SHEET

**Short Title:** NORMA SCOTT v. BAYER CORP, et al. **Case Number:**

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[X] Oakland, Rene C. Davidson Alameda County Courthouse (446)
[ ] Hayward Hall of Justice (447)
[ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) |
|---|---|---|
| Auto Tort | Auto tort (22) | [ ] 34 Auto tort (G) |
| | | Is this an uninsured motorist case? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] 75 Asbestos (D) |
| | Product liability (24) | [X] 89 Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] 97 Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] 33 Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] 79 Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] 80 Civil rights (G) |
| | Defamation (13) | [ ] 84 Defamation (G) |
| | Fraud (16) | [ ] 24 Fraud (G) |
| | Intellectual property (19) | [ ] 87 Intellectual property (G) |
| | Professional negligence (25) | [ ] 59 Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] 03 Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] 38 Wrongful termination (G) |
| | Other employment (15) | [ ] 85 Other employment (G) |
| | | [ ] 53 Labor comm award confirmation |
| | | [ ] 54 Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] 04 Breach contract / Wrnty (G) |
| | Collections (09) | [ ] 81 Collections (G) |
| | Insurance coverage (18) | [ ] 86 Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] 98 Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] 18 Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] 17 Wrongful eviction (G) |
| | Other real property (26) | [ ] 36 Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] 94 Unlawful Detainer - commercial — Is the deft. in possession of the property? [ ] Yes [ ] No |
| | Residential (32) | [ ] 47 Unlawful Detainer - residential |
| | Drugs (38) | [ ] 21 Unlawful detainer - drugs |
| Judicial Review | Asset forfeiture (05) | [ ] 41 Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] 62 Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] 49 Writ of mandate |
| | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] 64 Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] 77 Antitrust / Trade regulation |
| | Construction defect (10) | [ ] 82 Construction defect |
| | Claims involving mass tort (40) | [ ] 78 Claims involving mass tort |
| | Securities litigation (28) | [ ] 91 Securities litigation |
| | Toxic tort / Environmental (30) | [ ] 93 Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] 95 Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment |
| | | [ ] 08 Confession of judgment |
| Misc Complaint | RICO (27) | [ ] 90 RICO (G) |
| | Partnership / Corp. governance (21) | [ ] 88 Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] 68 All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name |
| | | [ ] 69 Other petition |

# Superior Court of California, County of Alameda
## Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial. You may choose ADR by:

- Indicating your preference on Case Management Form CM-110;
- Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or
- Agree to ADR at your Initial Case Management Conference.

**QUESTIONS?** Call (510) 891-6055. Email adrprogram@alameda.courts.ca.gov
Or visit the court's website at http://www.alameda.courts.ca.gov/adr

### What Are The Advantages Of Using ADR?

- ***Faster*** –Litigation can take years to complete but ADR usually takes weeks or months.
- ***Cheaper*** – Parties can save on attorneys' fees and litigation costs.
- ***More control and flexibility*** – Parties choose the ADR process appropriate for their case.
- ***Cooperative and less stressful*** – In mediation, parties cooperate to find a mutually agreeable resolution.
- ***Preserve Relationships*** – A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

### What Is The Disadvantage Of Using ADR?

- ***You may go to court anyway*** – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

### What ADR Options Are Available?

- ***Mediation*** – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.
  - **Court Mediation Program**: Mediators do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

- **Private Mediation**: This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

- ***Arbitration*** – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial and the rules of evidence are often relaxed. Arbitration is effective when the parties want someone other than themselves to decide the outcome.

  - **Judicial Arbitration Program** (non-binding): The judge can refer a case or the parties can agree to use judicial arbitration. The parties select an arbitrator from a list provided by the court. If the parties cannot agree on an arbitrator, one will be assigned by the court. There is no fee for the arbitrator. The arbitrator must send the decision (award of the arbitrator) to the court. The parties have the right to reject the award and proceed to trial.

  - **Private Arbitration** (binding and non-binding) occurs when parties involved in a dispute either agree or are contractually obligated. This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

## Mediation Service Programs In Alameda County

Low cost mediation services are available through non-profit community organizations. Trained volunteer mediators provide these services. Contact the following organizations for more information:

**SEEDS Community Resolution Center**
1968 San Pablo Avenue, Berkeley, CA 94702-1612
Telephone: (510) 548-2377    Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our diverse communities – Services that Encourage Effective Dialogue and Solution-making.

**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA 94550
Telephone: (925) 373-1035    Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.

*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA 94607
Telephone: (510) 768-3100    Website: www.cceb.org
Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

ALA ADR-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name, State Bar number, and address*)<br>TELEPHONE NO.: FAX NO. (*Optional*):<br>E-MAIL ADDRESS (*Optional*):<br>ATTORNEY FOR (*Name*): | *FOR COURT USE ONLY* |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY**<br>STREET ADDRESS:<br>MAILING ADDRESS:<br>CITY AND ZIP CODE:<br>BRANCH NAME | |
| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | |
| **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** | CASE NUMBER: |

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 1225 Fallon Street, Oakland, CA 94612.

1. Date complaint filed: ______________________. An **Initial Case Management Conference** is scheduled for:

   Date: Time: Department:

2. Counsel and all parties certify they have met and conferred and have selected the following ADR process (*check one*):

   ☐ Court mediation ☐ Judicial arbitration
   ☐ Private mediation ☐ Private arbitration

3. All parties agree to complete ADR within 90 days and certify that:

   a. No party to the case has requested a complex civil litigation determination hearing;
   b. All parties have been served and intend to submit to the jurisdiction of the court;
   c. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
   d. Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
   e. Case management statements are submitted with this stipulation;
   f. All parties will attend ADR conferences; and,
   g. The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_______________________________ ▶ _______________________________
(TYPE OR PRINT NAME) (SIGNATURE OF PLAINTIFF)

Date:

_______________________________ ▶ _______________________________
(TYPE OR PRINT NAME) (SIGNATURE OF ATTORNEY FOR PLAINTIFF)



Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]



Cal. Rules of Court, rule 3.221(a)(4)

Case MDL No. 2739 Document 1-1 Filed 07/21/16 Page 56 of 82

ALA ADR-001

| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER.: |
|---|---|

Date:

____________________ ▶ ____________________

(TYPE OR PRINT NAME) (SIGNATURE OF DEFENDANT)

Date:

____________________ ▶ ____________________

(TYPE OR PRINT NAME) (SIGNATURE OF ATTORNEY FOR DEFENDANT)

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: FAX NO. *(Optional)*: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** | |
| STREET ADDRESS: | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: | |
| BRANCH NAME: | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |
| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
| *(Check one)*: ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

**A CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date: Time: Dept.: Div.: Room:

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by** ***(name)***:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:



Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court, rules 3.720–3.730
www.courts.ca.gov

CM-110

| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER: |
|---|---|

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:
e. E-mail address:
f. Fax number:
g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**

a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b. **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110

| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER: |
|---|---|

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information):*

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply):* | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation):* |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for (*date*):<br>☐ Agreed to complete mediation by (*date*):<br>☐ Mediation completed on (*date*): |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for (*date*):<br>☐ Agreed to complete settlement conference by (*date*):<br>☐ Settlement conference completed on (*date*): |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for (*date*):<br>☐ Agreed to complete neutral evaluation by (*date*):<br>☐ Neutral evaluation completed on (*date*): |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for (*date*):<br>☐ Agreed to complete judicial arbitration by (*date*):<br>☐ Judicial arbitration completed on (*date*): |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for (*date*):<br>☐ Agreed to complete private arbitration by (*date*):<br>☐ Private arbitration completed on (*date*): |
| (6) Other (*specify*): | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for (*date*):<br>☐ Agreed to complete ADR session by (*date*):<br>☐ ADR completed on (*date*): |

CM-110

| PLAINTIFF/PETITIONER: <br> DEFENDANT/RESPONDENT: | CASE NUMBER: |
|---|---|

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify)*:

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:
(2) Name of court:
(3) Case number:
(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. **Economic litigation**
   a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.
   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

18. **Other issues**
   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

19. **Meet and confer**
   a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

   b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):*________

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

______________________________ ▶ ______________________________
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY)

______________________________ ▶ ______________________________
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

CM-015

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
M. Elizabeth Graham, State Bar #143805
Grant & Eisenhofer
123 Justison Street
Wilmington, DE 19801
TELEPHONE NO.: 302-622-7000 FAX NO. *(Optional):* 302-622-7137
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Norma Scott

*FOR COURT USE ONLY*

ENDORSED
FILED
ALAMEDA COUNTY
MAY 16 2016
CLERK OF THE SUPERIOR COURT
By [signature] Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME:

PLAINTIFF/PETITIONER: NORMA SCOTT
DEFENDANT/RESPONDENT: BAYER CORP., et al

CASE NUMBER: RG16815918
JUDICIAL OFFICER:
DEPT.:

## NOTICE OF RELATED CASE

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Cynthia Ripperger and Anthony Ripperger v. BAYER CORP., et al
   b. Case number: RG 16804878
   c. Court: [✓] same as above
      [ ] other state or federal court *(name and address):*
   d. Department: Civil
   e. Case type: [ ] limited civil [✓] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*
   f. Filing date: 2/23/2016
   g. Has this case been designated or determined as "complex?" [✓] Yes [ ] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [✓] involves the same parties and is based on the same or similar claims.
      [✓] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [ ] involves claims against, title to, possession of, or damages to the same property.
      [✓] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [✓] pending
      [ ] dismissed [ ] with [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title: Lisette Paredes and Juan Moreno v. BAYER CORP., et al
   b. Case number: RG 16804887
   c. Court: [✓] same as above
      [ ] other state or federal court *(name and address):*
   d. Department: Civil



Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007]

NOTICE OF RELATED CASE

Cal. Rules of Court, rule 3.300
www.courtinfo.ca.gov

Case MDL No. 2739 Document 1-1 Filed 07/21/16 Page 63 of 82

CM-015

| PLAINTIFF/PETITIONER: NORMA SCOTT<br>DEFENDANT/RESPONDENT: BAYER CORP., et al | CASE NUMBER: |
|---|---|

2. *(continued)*

e. Case type: ☐ limited civil ☑ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:

f. Filing date: 2/23/2016

g. Has this case been designated or determined as "complex?" ☑ Yes ☐ No

h. Relationship of this case to the case referenced above *(check all that apply)*:

☑ involves the same parties and is based on the same or similar claims.

☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

☐ involves claims against, title to, possession of, or damages to the same property.

☑ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

☐ Additional explanation is attached in attachment 2h

i. Status of case:

☑ pending

☐ dismissed ☐ with ☐ without prejudice

☐ disposed of by judgment

3. a. Title:

b. Case number:

c. Court: ☐ same as above

☐ other state or federal court *(name and address)*:

d. Department: Department 30

e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:

f. Filing date:

g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

h. Relationship of this case to the case referenced above *(check all that apply)*:

☐ involves the same parties and is based on the same or similar claims.

☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

☐ involves claims against, title to, possession of, or damages to the same property.

☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

☐ Additional explanation is attached in attachment 3h

i. Status of case:

☐ pending

☐ dismissed ☐ with ☐ without prejudice

☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: ______

Date: May 16, 2016

M. Elizabeth Graham
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ Elizabeth Graham [signature]
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER: NORMA SCOTT<br>DEFENDANT/RESPONDENT: BAYER CORP., et al | CASE NUMBER: |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

***(NOTE: You cannot serve the* Notice of Related Case *if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)***

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify)*:

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one)*:
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date)*:
   b. from *(city and state)*:

4. The envelope was addressed and mailed as follows:

   a. Name of person served:
   Street address:
   City:
   State and zip code:

   b. Name of person served:
   Street address:
   City:
   State and zip code:

   c. Name of person served:
   Street address:
   City:
   State and zip code:

   d. Name of person served:
   Street address:
   City:
   State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

| | |
|---|---|
| (TYPE OR PRINT NAME OF DECLARANT) | ▶ (SIGNATURE OF DECLARANT) |

GRANT & EISENHOFER P.A.
Attn: Graham, M. Elizabeth
123 Justison Street
Wilmington, DE 19801

Bayer Corp.

# Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Scott<br>Plaintiff/Petitioner(s)<br>VS.<br>Bayer Corp.<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG16815918</u><br><br>NOTICE OF HEARING |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing
Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 07/05/2016 TIME: 03:00 PM DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
201 13th Street, Oakland

Case Management Conference:
DATE: 08/09/2016 TIME: 03:00 PM DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
201 13th Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 30 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 268-5104. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 30.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments** at

**http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 30.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 30 by e-mail at Dept.30@alameda.courts.ca.gov or by phone at (510) 268-5104.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated: 05/19/2016 Chad Finke Executive Officer / Clerk of the Superior Court

By Digital

Deputy Clerk

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 05/20/2016.

By Digital

Deputy Clerk

GRANT & EISENHOFER P.A.
Attn: Graham, M. Elizabeth
123 Justison Street
Wilmington, DE 19801

Bayer Corp.

# Superior Court of California, County of Alameda
# Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Scott<br>Plaintiff/Petitioner(s)<br>VS.<br>Bayer Corp.<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG16815918<br><br>NOTICE OF HEARING |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 07/05/2016 TIME: 03:00 PM DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
201 13th Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 30 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 268-5104. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 30.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments** at **http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 30.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 30 by e-mail at Dept.30@alameda.courts.ca.gov or by phone at (510) 268-5104.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated: 05/19/2016 Chad Finke Executive Officer / Clerk of the Superior Court

By Digital

Deputy Clerk

---

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 05/20/2016.

By Digital

Deputy Clerk

GRANT & EISENHOFER P.A.
Attn: Graham, M. Elizabeth
123 Justison Street
Wilmington, DE 19801

Bayer Corp.

# Superior Court of California, County of Alameda
# Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Scott<br>Plaintiff/Petitioner(s)<br>VS.<br>Bayer Corp.<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG16815918<br><br>NOTICE OF HEARING (AMENDED)<br><br>Case Management Conference on 08/09/2016 has been vacated and rescheduled. |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above entitled action has been set for:

Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Case Management Conference:
DATE: 08/09/2016 TIME: 09:00 AM DEPARTMENT: 21
LOCATION: Administration Building, Fourth Floor
1221 Oak Street, Oakland

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions under Local Rule 3.90.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing (CDH) must be scheduled in the same department as that hearing.

If the information contained in this notice requires change or clarification, please call the courtroom clerk for the department where the CDH is scheduled.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling 1-888-882-6878, or faxing a service request form to 1-888-882-2946. This service is subject to charges by the vendor.

NOTE: An Updated Joint Case Management Statement in narrative form shall be filed in the clerk's office with a courtesy copy (hard copy) delivered directly to Dept. 21 at least five court days prior to the conference.

Dated: 06/01/2016

Chad Finke Executive Officer / Clerk of the Superior Court

By




Deputy Clerk

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 06/02/2016.

By 


Deputy Clerk

*14110111*

FILED
ALAMEDA COUNTY

JUN 01 2016

CLERK OF THE SUPERIOR COURT
By ____________ Deputy
SIANTE DEWBERRY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| MELISSA BIEDERMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BAYER CORP.; BAYER HEALTHCARE LLC; BAYER ESSURE INC. (F/K/A CONCEPTUS, INC.); BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER AG; and DOES 1 through 10,<br><br>Defendants. | Case No. RG16814029<br><br>FIRST AMENDED ORDER RELATING CASES |
| AND RELATED ACTIONS | |

IT IS HEREBY ORDERED:

The following cases are HEREBY DEEMED RELATED, and will be managed collectively in Department 21 by the Hon. Winifred Y. Smith:

RG16814029, *Biederman. v. Bayer Corp., et al;*

RG16813642, *Garcia v. Bayer Corp., et al;*

RG16813262 *Bianchi v. Bayer Corp., et al;*

RG16813616 *Brown v. Bayer Corp., et al;*

RG16811442 *Williams v. Bayer Corp., et al;*

RG16813429 *Lopez v. Bayer Corp., et al;*

RG16815716 *Fernandez v. Bayer Corp., et al;*

RG16813999 *Ramirez v. Bayer Corp., et al;*

RG16815712 *Ford v. Bayer Corp., et al;*

RG16810409 *Journey v. Bayer Corp., et al;*

RG16812166 *Ruiz v. Bayer Corp., et al;*

RG16804887 *Paredes v. Bayer Corp., et al;*

RG16809875 *Birruete v. Bayer Corp., et al;*

RG16809878 *Mattern v. Bayer Corp., et al;*

RG16809292 *Migliaccio v. Bayer Corp., et al;*

RG16809860 *Lance v. Bayer Corp., et al;*

RG16804878 *Ripperger v. Bayer Corp., et al;*

RG16809876 *Webb v. Bayer Corp., et al;*

RG16812199 *Root v. Bayer Corp., et al;*

RG16812269 *Salaiz v. Bayer Corp., et al;*

RG16812309 *Patterson v. Bayer Corp., et al;*

RG16812313 *Hyde v. Bayer Corp., et al;*

RG15771555 *Medali v. Bayer Healthcare LLC., et al;and*

RG16815918 *Scott v. Bayer Corp., et al.*

The Court further orders as follows:

1. The above referenced cases shall be reassigned to Dept. 21 for all purposes.
2. Any hearings pending in any other department are to be vacated and reset in Department 21. The court will expect the same narrative joint case management conference statement to be filed in each case before each CMC.
3. All notices of motions and ex parte applications in any of the related cases must be served on all parties in all of the related cases.

The clerk shall:

1. File a copy of this Order in all related cases;
2. Serve a copy of this Order on all parties in all related cases; and
3. Deliver a copy of this Order to the Supervising Judge – Civil, the Hon. Ioana Petrou.

June 1, 2016
Date

Winifred Y. Smith
Winifred Y. Smith
Judge of the Superior Court

Case 3:16-cv-03369-WHA Document 1-1 Filed 06/16/16 Page 74 of 82

Superior Court of California, County of Alameda
Department 21, Administration Building

Case # RG16 814029, et al
Case Name: Biederman et al. v. Bayer Corp., et al and Related Cases
Document: Order Relating Cases (First Amended)

## DECLARATION OF SERVICE BY MAIL (CCP 1013a)

I certify that the following is true and correct:

I am a Deputy Clerk employed by the Superior Court of California, County of Alameda. I am over the age of 18 years. My business address is 1221 Oak St. Oakland, California, 94612. I served the above-referenced document by placing copies in envelope(s) addressed as shown on the foregoing document or on the attached and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail in Oakland, California, following standard court practices.

Executed on June 1, 2016 at Oakland, California.

Chad Finke,
Executive Officer/Clerk of the Superior Court

by Sianté Dewberry

Sianté Dewberry
*Deputy Clerk*

| SHORT TITLE: Biederman et al. v. Bayer Corp., et al | CASE NUMBER: RG16 814029, et al |
|---|---|

ADDITIONAL ADDRESSEES

Grant & Eisenhofer P.A.
Attn: Graham, M. Elizabeth
123 Justison St.
Wilmington, DE 19801

Andrus Anderson LLP
Attn: Andrus, Lori
155 Montgomery Street, Suite 900
San Francsico, CA 94104

Motley Rice LLC
Attn: Cope, Breanne V
28 Bridgeside Blvd
Mt. Pleasant, SC 29464

Gibbs Law Group LLP
Attn: Gibbs, Eric H.
One Kaiser Plaza, Suite 1125
Oakland, CA 94612

Kershaw, Cook & Talley PC
Attn: Kershaw, William A.
401 Watt Avenue
27th Floor
Sacramento, CA 95864

Schmidt National Law Group
Attn: Schmidt, Martin
4241 Jutland Dr
Suite 200
San Diego, CA 92117

Walker, Hamilton & Koenig LLP
Attn: Hamilton, Timothy M.
50 Francisco St., Ste.460
San Francisco, CA 94133

Skikos, Crawford, Skikos & Joseph LLP
Attn: Crawford, Mark G
One Sansome Street
Suite 2830
San Francisco, CA 94104

Sidley Austin Brown & Wood LLP
Attn: Degen, Alycia A
555 West Fifth Street
Suite 4000
Los Angeles, CA 90013-1010

Sidley Austin LLP
Attn: Hill, Joshua
555 California Street
San Francisco, CA 94104

Smith, Patrick E.
112 E. Chapman Avenue
Suite B
Orange, CA 92866

# *Superior Court of California, County of Alameda*

## *Notice of Reassignment of Judge for All Purposes*

Case Number: RG16815918
Case Title: Scott VS Bayer Corp.
Date of Filing: 05/16/2016

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby reassigned by the Presiding Judge for all purposes to:**

| | |
|---|---|
| **Judge:** | **Winifred Y. Smith** |
| **Department:** | **21** |
| **Address:** | **Administration Building<br>1221 Oak Street<br>Oakland CA 94612** |
| **Phone Number:** | **(510) 267-6937** |
| **Fax Number:** | |
| **Email Address:** | **Dept.21@alameda.courts.ca.gov** |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure section 170.6 must be exercised within the time period provided by law. (See Code Civ. Proc. §§ 170.6, subd. (a)(2) and 1013.)**

**NOTICE OF NONAVAILABILITY OF COURT REPORTERS:** Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording.

Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

## General Procedures

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the René C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, George E. McDonald Hall of Justice, 2233 Shoreline Drive, Alameda, California, 94501 and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

ASSIGNED FOR ALL PURPOSES TO
JUDGE Winifred Y. Smith
DEPARTMENT 21

All parties are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1) and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference. The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days". Plaintiff received that form in the ADR information package at the time the complaint was filed. The court's Web site also contains this form and other ADR information. If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

Email is the preferred method of communicating with court staff in Department 21, particularly for scheduling of law and motion, ex parte application, and case management events. Telephone communications are possible, but use of email will greatly facilitate a prompt response to your inquiries. When a copy of a document must be transmitted to court staff, an email attachment is preferable to fax. Use of an email attachment or fax, however, is not a substitute for filing of pleadings or other documents. All email communications should be copied to all parties for whom an email address is available, so inclusion of available email addresses in the caption of all filed papers, as required by California Rule of Court 2.111(1) is critical.

## Schedule for Department 21

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Trial call is Monday at 9:00 am. Trials run Mondays through Thursdays at 9:00 am/9:30 am to 4:30 pm; expect to be in the courtroom from 9 to 5. Cases may "trail" a trial in progress.

- Case Management Conferences are held: Initial CMC's on Mondays and Tuesdays at 8:30 a.m; Continued CMC's on Mondays and Tuesdays at 8:45 a.m. Timely filed and complete CMC statements allow the court to post tentative CMC orders.

- Law and Motion matters are heard: Fridays at 10:00 am, 11:00 am, and *2:00 pm. *Only Asbestos matters are set at 2:00 pm.

- Settlement Conferences are heard: As specially set.

- Ex Parte matters are heard: The court prefers to resolve ex parte applications on the papers only. Before submitting an ex parte application on the papers, (a) email Dept. 21 to advise when papers will be filed, and (b) provide CRC 3.1203(a) notice to all parties.
- (ExParte Cont'd) Any written opposition must be filed within 24 hours of receipt of notice. If a matter is time sensitive, opposition is expected, and/or personal appearances are otherwise warranted, the parties may request a time for appearance via email to Dept. 21, copied to all parties. Such appearances, when permitted, will normally be specially set, and compliance with CRC 3.1203(a) will be strictly enforced. All other matters are specially set. Always check the website the day before the hearing for developments on your case. See link to above "List of documents" for more information on the department.
- Pretrial Conferences are held: Fridays at 9:00 a.m. The hearings are scheduled on a Continued Case Management Conference.

**<u>Law and Motion Procedures</u>**

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Email: Dept.21@alameda.courts.ca.gov

  When requesting to reserve a hearing, include the case name & number, title of the motion and identity of the moving party. The court may set a CMC on shortened time before allowing a discovery motion to be filed.

- Ex Parte Matters
  Email: Dept.21@alameda.courts.ca.gov

**<u>Tentative Rulings</u>**

The court may issue tentative rulings in accordance with the Local Rules. Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website: www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 21
- Phone: 1-866-223-2244

Dated: 06/01/2016

facsimile

Presiding Judge,
Superior Court of California, County of Alameda

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as attached hereto and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 06/02/2016

By digital

Deputy Clerk

| SHORT TITLE: Scott VS Bayer Corp. | CASE NUMBER: RG16815918 |
|---|---|

ADDITIONAL ADDRESSEES

GRANT & EISENHOFER P.A.
Attn: Graham, M. Elizabeth
123 Justison Street
Wilmington, DE 19801

GRANT & EISENHOFER P.A.
Attn: Graham, M. Elizabeth
123 Justison Street
Wilmington, DE 19801

Bayer Corp.

# Superior Court of California, County of Alameda
# Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Scott<br>Plaintiff/Petitioner(s)<br>VS.<br>Bayer Corp.<br><br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG16815918<br><br>NOTICE OF HEARING (AMENDED)<br><br>Complex Determination Hearing on 07/05/2016 has been vacated and rescheduled. |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 08/09/2016 TIME: 09:00 AM DEPARTMENT: 21
LOCATION: Administration Building, Fourth Floor
1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 21 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6937. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 21.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments** at **http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be

scheduled for hearing in Department 21.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 21 by e-mail at Dept.21@alameda.courts.ca.gov or by phone at (510) 267-6937.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated: 06/03/2016 Chad Finke Executive Officer / Clerk of the Superior Court

By 


Deputy Clerk

---

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 06/06/2016.

By 


Deputy Clerk